UPGRADE CORPORATION *et al.*, Plaintiffs-Appellants, *v.* MICHIGAN CARTON COMPANY, Defendant-Appellee.

First District (5th Division)    No. 80-708

Opinion filed June 30, 1981.

Jeffrey Cole, of Chicago (Jeffrey Neal Cole, Ltd., of counsel), for appellants.

Bruce B. Krost and Charles R. Rust, both of Woodling, Krost & Rust, of Cleveland, Ohio (William T. Rifkin and McDougall, Hersh & Scott, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiffs, Upgrade Corporation (Upgrade) and American Pulp Corporation (American), brought this action for the misappropriation of a trade secret against defendant, Michigan Carton Company, a manufacturer of paperboard used in the construction of cereal and other boxes.[1] The jury was unable to reach a verdict, and the court granted defendant's post-trial motion for judgment in its favor, pursuant to section 68.1 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 68.1). Plaintiffs appeal.

The sole issue presented on appeal is whether the trial court properly granted defendant's post-trial motion to enter judgment in its favor.

In 1972 Bud Bender formed Upgrade. In that same year he and a partner formed American for the purpose of manufacturing wet lap, a product intended as a substitute for the expensive grades of wastepaper used in the manufacture of paperboard boxes. Bender was the president of both corporations, to which he assigned the controversial trade secret.

To realize its purpose, American purchased a very large, dilapidated paper mill in Kalamazoo, Michigan, and with a small staff reactivated a portion of the plant. One truckload of wet lap material was sold to defendant in the latter part of 1972. In January 1973, due to the failure of American's plant to operate routinely, Bender's partner wished to sever the relationship. As Bender lacked the necessary cash to buy out his partner, he contacted defendant seeking a loan of the necessary funds. Bender suggested an affiliation which would enable him to borrow $15,000 and in return provide defendant with nearly all of American's wet lap production.

On February 15, 1973, an agreement between Bender, plaintiffs and defendant was signed whereby defendant agreed to loan American $15,000. In exchange Bender was to execute a promissory note for $15,000, payable in six months at 7 percent interest per annum. The agreement also gave defendant the option, when the note came due, to choose between either payment in full or 50 percent of the outstanding shares of American in satisfaction of the debt. Additionally, two of defendant's personnel were appointed to American's board of directors.

---

[1] Defendant filed a counterclaim seeking damages resulting from monies loaned to plaintiffs or expended on plaintiffs' behalf. At the close of all the evidence the trial court entered an order granting defendant's motion for a directed verdict on its counterclaim and subsequently denied plaintiffs' motion to vacate the judgment. Plaintiffs do not appeal the orders of the trial court relative to defendant's counterclaim.

Defendant also agreed to guarantee the payment of American's utility bills and to purchase the raw materials necessary to the production of wet lap. The cost of the materials was to be deducted from the amount plaintiffs charged defendant for the wet lap product.

Although the initial wet lap received by defendant was satisfactory, some problems in quality were experienced in later shipments. To improve both the quality and quantity of wet lap pulp, it was agreed between the parties that certain of defendant's engineering and technical personnel would spend a four-week period at American's plant facility. On May 17, 1973, prior to rendering this assistance, James Barclay, defendant's director of purchasing, signed on defendant's behalf a confidential disclosure agreement. By the terms of the agreement defendant agreed in pertinent part to treat as confidential plaintiffs' "know how" relative to the de-inking, wax emulsification and stabilization process for the repulping of inked papers and boards. The agreement was prepared by plaintiffs' attorney and signed in his Chicago office. Defendant's personnel subsequently visited American's plant.

In June 1973, Bender sought an additional $250,000 in funds from defendant to secure additional equipment, pay its then current indebtedness and provide a 30-day operating capital. Following receipt of this request, Dan Int-Hout, defendant's president, called a meeting of defendant's senior staff. The staff as a whole reported continuing problems with the quality and quantity of plaintiffs' product. Int-Hout determined to end defendant's affiliation with plaintiffs. By the end of July 1973, defendant withdrew its financial support, and its two representatives resigned from plaintiffs' board of directors. Shortly thereafter, plaintiffs ceased production of its wet lap product. In December 1973, defendant sent Bender a letter itemizing American's $97,845.87 indebtedness. In January 1974, plaintiffs commenced this suit.

During trial, at the close of plaintiffs' evidence, defendant made a motion for a directed verdict which was denied on the basis that plaintiffs had established a *prima facie* case. Defendant's motion was not renewed at the close of all of the evidence and the case went to the jury. The jury was unable to reach a verdict, whereupon the court declared a mistrial and discharged the jury. Defendant's post-trial motion for judgment in its favor was granted by the court on the basis that there was insufficient evidence as to defendant's use of plaintiffs' trade secret.

OPINION

■■ Plaintiffs assert that the trial court erred in granting defendant's post-trial motion, emphasizing that the court had determined at the close of plaintiffs' evidence that plaintiffs had established a *prima facie* case.

However, the denial of defendant's motion for a directed verdict at the close of plaintiffs' evidence placed no limitation on the court's ability to grant defendant the post-trial relief sought. Relief after trial in a jury case may include the entry of judgment if under the evidence in the case it would have been the duty of the court to direct a verdict without submitting the case to the jury. (Ill. Rev. Stat. 1979, ch. 110, par. 68.1(2).) This is true even though no motion for a directed verdict was made or if made was denied or the ruling thereon reserved. (Ill. Rev. Stat. 1979, ch. 110, par. 68.1(2).) Additionally, the failure of the jury to reach a verdict does not foreclose a party from seeking such post-trial relief. Ill. Rev. Stat. 1979, ch. 110, pars. 68.1(2), (3).

The standard by which verdicts ought to be directed and judgments *n.o.v.* entered in jury cases has been set forth in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. According to *Pedrick*, verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent of the motion, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (37 Ill. 2d 494, 510.) This same standard is to be applied by reviewing courts in determining whether or not the trial court has erroneously directed a verdict. *Sherrod v. Brannock* (1978), 67 Ill. App. 3d 972, 385 N.E.2d 735.

In accordance with the standard established by *Pedrick*, we have meticulously reviewed the record in this case. Notwithstanding the voluminous nature of the record, however, only that evidence relative to the alleged use of plaintiffs' trade secret need be discussed.

The essential thrust of plaintiffs' amended complaint is that defendant, in violation of its disclosure agreement, used plaintiffs' secret nonchemical de-inking process to manufacture topliner from heavily inked papers. Topliner is the top layer of a paperboard product which is usually whiter and brighter than the underlying paperboard layers. It is the layer to which a coating is applied in preparation for subsequent printing. This secret process, which plaintiffs assert allows the utilization of less expensive heavily inked papers in the preparation of the topliner, consists of six steps:

(1) loading a pulper machine with a mixture of printed wastepaper specifically including 50 percent heavily printed bleached Kraft and water;

(2) adding caustic (lye) to the pulper to raise the alkalinity to a pH value of 10;

(3) heating the mixture to 130° to 140° F;

(4) operating the pulper for a time period of 30 to 50 minutes;

(5) directing the resulting mixture through a screen to remove contaminants;

(6) grinding the mixture with a deflaker machine.

■■ Plaintiffs readily admit that the evidence they introduced at trial to establish defendant's use of their trade secret was largely circumstantial. Plaintiffs contend, however, that this evidence was sufficient to withstand defendant's post-trial motion for judgment in its favor in light of *Pedrick's* admonition that the evidence in this case and all reasonable inferences derived therefrom must be considered in a light most favorable to plaintiffs. (*Weiner v. Trasatti* (1974), 19 Ill. App. 3d 240, 311 N.E.2d 313.) However, a fact cannot be established by circumstantial evidence unless the circumstances are of a nature and so related to each other that the proposed conclusion is the only one that can be drawn; mere conjecture, guess or suspicion is insufficient. *Lewis v. Mount Greenwood Bank* (1980), 91 Ill. App. 3d 481, 414 N.E.2d 1079.

The circumstantial evidence upon which plaintiffs most heavily rely to infer defendant's use of their six-step process is a compilation of data showing defendant's raw material usage in total tonnage from 1970 to 1976. This data showed a substantial decrease in defendant's use of expensive bleached pulp material from 1970 to 1976 and a corresponding increase during the same period of defendant's use of less expensive, more heavily inked materials, such as printed bleached Kraft, ground wood shavings, no. 1 book and ledger. This data did not indicate whether the heavily inked materials were used by defendant in the manufacture of the topliner, filler layers, or backliner of its paperboard products.

Plaintiffs also introduced into evidence approximately 83 furnish sheets for the period 1962 through 1978 selected by them from the thousands available in defendant's files. Furnish sheets are analogous to recipes. For each customer's paperboard order, defendant wrote up a furnish sheet indicating the materials scheduled to be used in the manufacture of the topliner, filler and backliner of that particular order. None of the selected furnish sheets dated prior to defendant's affiliation with plaintiffs in 1973 listed any heavily printed wastepapers as a component in defendant's topliner. Furthermore, those furnish sheets dated subsequent to defendant's affiliation with plaintiffs did indicate heavier inked grades of wastepaper listed as component material in the manufacture of topliner. These furnish sheets did not indicate that printed bleached Kraft constituted 50 percent of the wastepaper mixture as required by plaintiffs' process.

The most that can be said about this evidence when viewed in the light most favorable to plaintiffs is that after defendant's affiliation with plaintiffs in 1973 defendant used the same types of raw materials called for in the first step of plaintiffs' six-step process. However, that defendant

followed plaintiffs' first step cannot be inferred as there is no evidence to show that printed bleached Kraft constituted 50 percent of defendant's raw material mixture. Nor can the circumstantial evidence of defendant's raw material usage prove the pH level which defendant used (step 2), the temperature at which the material was pulped (step 3), the length of time the material remained in the pulper (step 4), nor the methods, if any, defendant used to screen (step 5) or deflake (step 6) the resulting mixture.

In applying the *Pedrick* standard, courts draw all reasonable inferences in favor of the opponent of the motion. (*Weiner v. Trasatti* (1974), 19 Ill. App. 3d 240, 311 N.E.2d 313.) In the instant case, however, it is not reasonable to infer the process by which defendant manufactured its topliner merely from the records of the types and total quantities or raw materials utilized.

■■ The record reveals that plaintiffs introduced no other evidence direct or circumstantial which tended to prove that defendant utilized any or all of these six steps in the manufacture of topliner. The only evidence adduced as to the utilization of any of these steps was that introduced by defendant. That evidence showed that a typical process it used to manufacture topliner did require screening of the resultant pulped mixture for contaminant removal. Taken together this evidence did not establish defendant's utilization of the requisite six steps in plaintiffs' process. Verdicts may be directed when a plaintiff fails to introduce any evidence tending to prove a necessary allegation of his complaint. (*Publication Corp. v. Chicago River & Indiana R.R. Co.* (1977) 49 Ill. App. 3d 508, 364 N.E.2d 523.) In the instant case plaintiffs failed to introduce evidence supporting their contention that defendant used their process and, therefore, the trial court correctly entered judgment for defendant. *Bailey v. City of Decatur* (1977), 49 Ill. App. 3d 751, 364 N.E.2d 613.

For the reasons cited herein, we affirm.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.