MARVIN JOHNSON et al., Plaintiffs-Appellants, v. WALTER TIPTON et al., Defendants-Appellees.

Second District    No. 80-775

Modified opinion filed on denial of rehearing February 16, 1982.

Bernard P. Reese, Jr., of Reese and Reese, of Rockford, for appellants.

Eugene R. Pigatti and Robert G. Coplan, both of Rockford, for appellees.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiffs, members of a farm family, claim that they were injured in their health and property by heavy metal and phenol pollution resulting from storage of defendant Valspar Corporation's manufacturing wastes on the adjoining farm occupied by the defendant, Walter Tipton. A jury returned a verdict in favor of both defendants, upon which the trial court entered judgment. Subsequently, the court denied post-trial motions for judgment *n.o.v.* or, in the alternative, for a new trial. Plaintiffs appeal, contending that the verdict is against the manifest weight of the evidence and that various trial errors necessitate a new trial. Additionally, plaintiffs contend that the court erred in dismissing two members of the family, Elizabeth Johnson Schoon and Rebecca Johnson Hampton, who sought to be added as parties plaintiff in the amended complaint.

The plaintiffs moved to their farm on Wempleton Road in Winnebago County in early 1954. They used a 36-foot well ("the shallow well") for family purposes, including drinking, cooking, and bathing, without any problems until 1968, when they began noting an occasional off-taste and odor. They drank the water until May 16, 1972, when they noticed a strong foul taste and switched to using a neighbor's water. They drilled a deep well in March of 1974 and used water from it until September 1975 when they went back to hauling water. In March of 1976, plaintiffs moved from their farm.

The plaintiffs, after discovering the foul taste in 1972, made various attempts to obtain expert opinions as to any possible contamination of their water supply. In May of 1972, Gerald Kehoe of the EPA sampled water from the shallow well and found no abnormal concentrations of heavy metals. The EPA took samples in April of 1973 and at other times, and, according to Mrs. Johnson's testimony at trial, generally told the Johnsons that their water was within legal standards for drinking water.

Craig Loudat of the Illinois Department of Public Health inspected the shallow well in April of 1973 and arranged for an analysis of a water sample from the well. The analysis indicated no traces of heavy metals, but did reveal the presence of bacteria and "extremely high" levels of nitrates. The Winnebago County Health Department's analyses of water samples from the plaintiffs' well, also conducted in 1973, indicated negligible odor and no traces of heavy metals.

Rudy Loher, then of the Erickson Chemical Company, tested water samples and investigated the premises sometime before February 1, 1974. He noted the similarity of the odor of water from the shallow well and that of Tipton's quarry. Loher's subsequent analysis revealed 1.9 ppb of mercury in the water, above the 1973 discharge limits of .5 ppb. He advised the Johnsons not to drink the water from the shallow well. His

analysis also revealed the presence of phthalate, a substance quite similar chemically to phenols. Loher also investigated the water in June of 1974, finding under .1 ppb of mercury and a low level of lead in the new well.

Dennis Johnson, then of the Illinois EPA, began investigations of the Johnson wells and property in July 1975, taking samples of water from both wells in September 1975. On his trip to the Johnson farm, Dennis Johnson observed the storage of wastes in both the quarry and hedgerow on the Tipton farm. He noticed that water from the shallow well had a distinct odor and "residual taste." He was also able to identify solidified resins in soil that he dug up from the hedgerow area.

Johnson broke off a piece of resin and had a laboratory analyze its chemical content. The sample was found to contain 290 ppb of phenol, which Johnson testified to as "hazardous" and toxic, and 290 times the 1972 Federal recommended standard of one ppb. Samples from the wells showed phenol concentrations of 6 ppb in the deep well and 7 ppb in the shallow well. The samples also showed mercury levels of 0.2 ppb in the shallow well and 0.0 ppb in the deep well.

Johnson testified that, in his opinion, "phenols, depending on their molecular structure, can be either one hundred percent soluble in water or limited to a fifty percent solubility" and that "fifty percent of a phenolic family of phenolic chemicals would be soluble in water." Valspar offered testimony by Frederick Heiss, who was in charge of Valspar's paint lab in the early seventies that its phenols were not water-soluble.

James Daugherty of the Illinois EPA analyzed four samples collected from barrels on the Tipton premises on December 10, 1975. The tests showed a phenol concentration of as much as 80,000 ppm.

Plaintiffs ascribe a large number of ailments to themselves and their farm animals to water from the shallow and deep wells. The plaintiffs' hogs developed breeding problems and birth defects beginning in 1968; the plaintiffs' cow occasionally gave milk with an off-taste before 1969 and was sold in 1970 because of failure to breed; in 1969 her six-month old calf convulsed and died. Chickens and family pets, including a canary, a gerbil, and two parakeets also developed a variety of physical ailments in the early 1970's.

Violet Johnson developed several ailments, beginning in 1967 with an allergy that caused swelling in her lip and loss of her voice. She began feeling tired and experiencing chills and stomach pains shortly thereafter up through 1974, and had one tumor or "polyp" removed between 1971 and 1972 and another removed in 1977. Her condition appears to have improved after 18 chelation treatments by physician John Olwin between November of 1978 and April of 1980.

Marvin Johnson started noticing problems with his health in 1969 with tiredness, headaches, trembling in his hands and had difficulty sleep-

ing. He developed chest pains in 1973. A lump in his urine passage was removed in 1979.

Fred Johnson developed an allergy in 1967, along with a rash, stomach pains, and tiredness.

Donald Johnson's problems began in January 1970 with pains in the heels, difficulty walking, headaches, a sore throat, a rash, slurred speech, and allergies. In 1975 he was given an EEG; the result was abnormal. Dr. Hambrook, a neurologist, and Dr. Bender, a neurosurgeon, found no signs of heavy metal intoxication when they tested him in 1974. After seeing Dr. Olwin for treatment, Donald improved and felt "pretty good" by trial time.

Rebecca Johnson started experiencing stomach pains along with list-lessness and a lack of strength in 1968. Her condition began to improve around 1973.

Elizabeth Johnson started feeling ill about 1967, experiencing stomach pains and a virus from which she recovered slowly, in addition to a skin rash and nervousness.

Dr. Olwin, the family physician, found high levels of lead in the urine of each family member and believed that the ill health of the family, except for Rebecca's, was linked to the high levels of lead. Dr. Ann Reynolds of Ohio State University testified that blood and hair samples from the plaintiffs indicated very high levels of mercury for Fred, Donald, Rebecca and Mrs. Johnson and that organic mercury in the water was a possible source. The plaintiffs' levels of lead were about normal, and the levels of mercury were not in the poisoning range.

Dr. John W. Clayton of the University of Arizona, who had been at the University of Wisconsin at the time that he met the Johnsons in 1972, conducted an experiment on the well water with rats, which showed no difference between test groups of rats fed the water over control groups that did not get the water. At his suggestion the plaintiffs conducted a similar experiment with two parakeets in March 1973. The parakeet that drank the well water became very ill and disturbed; the other bird experienced no problems. Dr. Clayton expressed his personal opinion that phenols were hazardous above a "threshold limit value" of 5 ppm, but conceded that this was his opinion only and that he had conducted no studies on the toxicological effects of phenols.

There was evidence that most of the Johnsons' farm is southeast of the bordering Tipton farm and that the "back" 80 acres of the Johnson farm share a border running east-to-west with a southerly part of the Tipton farm. A hedgerow on the Tipton farm runs from north to south, with the southerly end bordering on the Johnsons' property about three-fourths of a mile from the Johnsons' farm house.

An old limestone quarry is located on Tipton's farm, near the north-

west corner. From at least 1963 on Tipton used this quarry to dump all matter of debris, junk and waste, including liquid waste from the Essex Wire Corp. Tipton received barrels of Essex' wire waste from 1966 through 1975 and would customarily pour this waste out onto the ground and burn it. The Department of Public Health after investigation obtained an injunction against Tipton dated October 4, 1972, prohibiting him from "depositing any debris, solvents, chemicals, trash or other materials of any nature" on his property.

Defendant Valspar's Midwest Synthetics division is primarily involved in manufacturing resins. Waste matter from its processes was, during the time in question, disposed of in 55-gallon drums. This waste contained phenols which were not leachable, i.e., water-soluble. Until the fall of 1971, the wastes were disposed of in a dump in Rockford, but after the dump was closed to liquid waste the EPA instructed the dumping contractor to store the drums elsewhere until the EPA could find a disposal site. There was testimony that the waste contractor started hauling the barrels out to Tipton's property for storage "in the early seventies." It was agreed that the waste would be stored in the hedgerow until the EPA could find a disposal site. The barrels from Valspar were removed in December of 1973. At that time the number was estimated at anywhere from 200 to 500 by various witnesses.

Tipton testified that he never actually dumped the contents of any of the barrels onto the ground. However, there was photographic evidence and testimony that many of the barrels were tipped over with the contents leaking onto the ground.

## I

■■ We approach plaintiffs' contention that the verdict was against the manifest weight of the evidence both on liability and actual damages in light of the familiar rule: "It is the jury's function to determine the preponderance of the evidence, and a reviewing court will reverse only if this determination is against the manifest weight of the evidence." *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 553.

Plaintiffs' contention that judgment should have been entered for plaintiffs on the issue of liability is subject to the also familiar rule that a judgment *n.o.v.* is to be entered only in those cases ·in which all of the evidence when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could stand. See, e.g., *Walling v. Lingelbach* (1976), 65 Ill. 2d 244, 247.

Under the standards, the court properly denied the *n.o.v.* motion and the jury's determination is adequately supported by several considerations. First, it appears that the family's illnesses (and those of the animals)

predated the storage of Valspar's barrels on the Tipton property by several years. Second, although Dennis Johnson believed that the contents of the barrels leaked in a southeasterly direction into the Johnsons' wells, Ross Brower, a professional geologist, stated that the flow could have been in any of four directions. The jury also viewed the premises and could observe that the Johnson property was uphill from Tipton's.

The causal link between phenols and the plaintiffs' health was also subject to question. No medical testimony specifically linked the illnesses to phenols, and testimony by Craig Loudat of the Illinois Department of Public Health suggested the alternative explanation of hazardous levels of bacteria and nitrates in the plaintiffs' shallow well, which he stated was poorly constructed.

It does not appear that any of the experts who tested the Johnson wells found concentrations of mercury above the State standard for safe drinking water of 2 ppb. Loher's conclusion that the well had a level of mercury above the standard was based on his assumption that the standard was .5 ppb (his test revealed a level of 1.9 ppb). Nor does anyone appear to have found levels of lead above any accepted safety standard. Dr. Reynolds conceded that blood and hair samples from the plaintiffs showed mercury levels below the poisoning range and approximately normal levels of lead. Dr. Clayton went so far as to state that the disposal of hazardous wastes was "one of the probable causes" for the family's health problems. Dr. Olwin found abnormally high levels of lead in plaintiffs' urine specimens when he tested them in 1976 and that there was a likely causal relationship between these levels and the plaintiffs' ill-being; but his tests also revealed that no family member had blood levels of lead over the Illinois legal level and that only Fred Johnson had an "unacceptable" urine sample obtained by a method other than "provocative testing." Moreover, nothing in Dr. Olwin's testimony tied or was intended to tie the plaintiffs' blood and urine levels of various metals to any particular source. We therefore conclude that the trial court did not err in denying the post-trial motion for a verdict *n.o.v.*, or in denying the alternative motion for a new trial.

## II

We also conclude that plaintiffs are not entitled to a new trial based on their claim of trial errors.

Plaintiffs have placed particular emphasis on their claim that they were denied the right to recover nominal and punitive damages without regard to whether they were able to show actual damages. They argue that although the court gave an instruction that the defendants were engaged in an ultrahazardous occupation it erred in refusing to give their instruction No. 14 defining a "trespasser."

Although the plaintiffs are correct in asserting that every trespass

entitles the plaintiff to at least nominal damages (see, *e.g.*, *First National Bank v. Amco Engineering Co.* (1975), 32 Ill. App. 3d 451, 455), it was not error to refuse the tendered instruction. Plaintiffs reason that the ultrahazardous instruction was the basis for strict liability, thus that the application of the strict liability doctrine under an ultrahazardous activity would be "akin to the finding of an intentional intrusion of land * * *." We cannot agree with this reasoning. The Illinois Supreme Court has held that ultrahazardous conduct which causes an intrusion upon land of another, requiring the application of the doctrine of strict liability, is distinct from negligent or intentional intrusion. (*Dial v. City of O'Fallon* (1980), 81 Ill. 2d 548, 553.) In *Dial*, the court noted that "conduct intended to cause an intrusion on the plaintiff's premises * * *" is the only type of invasion in which "recovery may be sought purely on the basis of the tort of trespass. 1 F. Harper & F. James, Torts, sec. 1.4, at 11-12 (1956)." (81 Ill. 2d 548, 553.) It further relied on the Restatement (Second) of Torts §158(a) definition of a trespasser as one who intentionally enters land in the possession of (another), or causes a thing or a third person to do so. 81 Ill. 2d 548, 553-54.

Thus an allegation of abnormally hazardous activities does not allow the plaintiffs to dispense with any pleading or proof of intent. Since intent was not pleaded or proved, and negligence was not in issue, the trial court properly refused instructions based on the doctrine of trespass. It follows also that the trial court did not err in giving defendants' special interrogatory which asked whether the defendant Valspar was guilty of willful and wanton conduct which proximately caused the injuries, which the jury answered "No," and in refusing plaintiffs' instruction on punitive damages. Plaintiffs were not entitled to argue and recover punitive damages based on trespass when the elements of the trespass action were not alleged or proved.

### III

■■ Other trial rulings of which plaintiffs complain did not constitute reversible error. The determination of the admissibility of evidence rests primarily in the discretion of the trial court, and its decisions will be reversed only upon a clear abuse of that discretion. (*Country Mutual Insurance Co. v. Adams* (1980), 85 Ill. App. 3d 501, 506.) We will refer briefly to plaintiffs' claims of error, none of which we find to amount to a clear abuse of discretion:

1. Plaintiffs sought to introduce a 1973 EPA letter to Tipton and a 1974 EPA interoffice memo relating to Tipton's failure to dispose of certain barrels of waste on his property. These dealt with barrels in a quarry some distance from the hedgerow where Valspar's barrels were kept and, in the circumstances, were irrelevant to the matters on trial.

2. Plaintiffs sought to introduce a newspaper article with reference to

Valspar's alleged discharge of mercury into the Rock River. This was properly excluded both as hearsay and as being irrelevant to Valspar's storage of barrels on Tipton's property.

3. Similarly, the 1971 correspondence between Valspar and the Corps of Engineers regarding Valspar's application to discharge water into the Rock River which had no relevance to the matter on trial was properly excluded both as irrelevant and as constituting hearsay.

4. Correspondence between Valspar and the State of Illinois regarding discharge by Valspar into the Rock River was properly excluded on similar grounds.

5. Photographs of burning on the Tipton farm were properly excluded as irrelevant to the storage of wastes several years later.

6. 1975 laboratory analyses of wells, other than the plaintiffs', in the general area were properly ruled inadmissible. While plaintiffs state that these analyses were entitled to admission as evidence of the southeasterly water flow from Tipton's premises it does not appear that that position was taken in the trial court. The record reveals that plaintiffs' attorney asked Dennis Johnson whether wells other than the plaintiffs' were analyzed at the time, counsel for defendant Tipton objected on relevance grounds and counsel for plaintiffs thereby withdrew the question. The court then sustained the objection. No evidence linking neighboring wells to anything in the barrels stored on Tipton's property was adduced. It should also be noted that the court did admit laboratory analyses of the plaintiffs' wells and was justified in concluding that the analyses of other wells were irrelevant.

7. Contrary to plaintiffs' contention, the trial court admitted into evidence defendant Valspar's answers to interrogatories containing lists of chemicals manufactured. The judge indicated that they would not go into the jury room, and plaintiffs did not object.

8. Plaintiffs charge that Valspar refused to cooperate in producing witnesses or exhibits. However, it is unclear what evidence, if any, was, in fact, not produced. The plaintiffs appear to be complaining principally on the lack of knowledge that former Valspar officials displayed at trial, which could have been explained by the passage of about eight years between the time the Valspar barrels were hauled to Tipton's property and the time of trial. At any rate, it was not shown what, if any, prejudice to the plaintiffs occurred from this complaint.

9. Plaintiffs sought to introduce a display of Valspar's 1980 product line. This was properly denied as irrelevant to storage of materials produced no later than 1972.

10. Plaintiffs sought to introduce certain bottles and a ruptured can of paint found by Dennis Johnson near the Tipton hedgerow. The court properly rejected the introduction of these items as against Valspar, as no

connection between the items and Valspar was established. Moreover, all of the jars were admitted, and the only things excluded were a quarter-pint can of paint and two paint rollers.

11. Plaintiffs complain of the exclusion of testimony of Dennis Johnson regarding the samples taken from Tipton's farm and testimony on the effects of undissolved phenols. However, the testimony was properly excluded for failure to lay a proper foundation and because of the improper assumption of facts not in the record as a basis for the questioning.

12. Plaintiffs' medical bills were properly rejected for lack of foundation showing any relationship between the bills and the alleged pollution-related illnesses.

13. The court did not err in refusing to allow evidence of the cost of analyzing plaintiffs' waste samples. It was irrelevant.

14. The plaintiffs for the first time in their reply brief refer to the testimony of Loher on his observation of water samples from the Johnsons' well and claim that his testimony was unduly restricted. Loher's opinion as to what was in the drums was properly excluded as speculation; thus, so was his testimony as to the connection between the water and the drums since there was no evidence that Loher did more than see and smell the drums. Further, the question objected to related to Loher's observations of the quarry and not the hedgerow where Valspar's barrels were stored.

15. The trial court permitted Marshall Hungness, who had resided with his family on the Johnson premises since October 1977, to testify that he and his family had suffered no health problems from the water on the premises and that the Illinois EPA had analyzed well water from the farm in 1979 and found no problems. Plaintiffs assert it was error to allow such testimony, yet the record reveals no objection to any of the testimony at the trial. Moreover, Hungness had lived on the farm since late 1977 and evidence of his physical condition at that time was relevant to the issues of what effects the alleged contaminants had, and whether leaks from Tipton's barrels were the cause of any illnesses reported years after the storage of the barrels on Tipton's property.

## IV

Plaintiffs urge that the court erred in dismissing Elizabeth Johnson Schoon and Rebecca Johnson Hampton as parties plaintiff.

■■ Elizabeth and Rebecca were named as parties plaintiff for the first time in counts IV and V of the second amended complaint, which was filed June 29, 1974. The defendants moved, before trial, to dismiss the entire complaint as barred by the statute of limitations (Ill. Rev. Stat. 1977, ch. 83, par. 15). The trial court denied the motion as to Mr. and Mrs.

Johnson, Donald Johnson, and Fred Johnson, but granted it as to Elizabeth and Rebecca. We agree with Elizabeth and Rebecca that the trial court erred, and we reverse.

Counts IV and V of the second amended complaint do not state valid causes of action in trespass as no possessory interest in the land is asserted by Elizabeth and Rebecca. (*Krejci v. Capriotti* (1973), 16 Ill. App. 3d 245, 247; *Smith v. Wunderlich* (1873), 70 Ill. 426, 434.) However, counts IV and V do state valid causes of action for strict liability (ultrahazardous activity) and negligence, and we are unable to say that these causes of action are, as a matter of law, barred by the applicable two-year limitation.

Counts IV and V allege that the seepage of chemicals onto the Johnson property continued up until January 23, 1976. Where a tort involves a continuing or repeated injury, the limitation period does not begin until the date of the last inquiry or when the tortious acts cease. (*City of Rock Falls v. Chicago Title & Trust* (1973), 13 Ill. App. 3d 359, 364.) The complaint alleges a course of tortious conduct which brings it within the two-year period. Alternatively, we hold the "time of discovery" rule applicable to the injury alleged. Under this rule, the cause of action does not accrue until the plaintiff knows or reasonably should know of an injury and also knows or reasonably should know that the injury was caused by the wrongful acts of another. (*Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161; *Witherell v. Weimer* (1981), 85 Ill. 2d 146.) When a plaintiff is on such notice is generally a question for the trier of fact. (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 156.) Here, Elizabeth and Rebecca were dismissed before trial; and we thus cannot determine as a matter of law from their pleadings when they were on notice of the injury or that such injury was wrongfully caused. We therefore hold that the trial court erred in dismissing them as parties plaintiff and that they are entitled to pursue their causes of action for personal injuries under counts IV and V of the second amended complaint.

We conclude that the jury's verdict was not against the manifest weight of the evidence as to either defendant and that the judgments in favor of both defendants were proper. The cause of action as to Elizabeth Johnson Schoon and Rebecca Johnson Hampton, however, is not barred by the statute of limitations as a matter of law, and the order dismissing them as plaintiffs is reversed and the cause remanded as to them. Based upon our resolution of the case as to the trial parties and considering that the case on retrial may be different from the record before us, we do not reach other issues urged by the plaintiff.

The judgments finding in favor of the defendants and against the plaintiffs, Marvin Johnson, Violet I. Johnson, Donald Johnson, and Fred Johnson, are affirmed; the order dismissing Elizabeth Johnson Schoon

and Rebecca Johnson Hampton as parties plaintiff is reversed and the cause remanded as to them.

Affirmed in part, reversed in part and remanded in part.

UNVERZAGT and VAN DEUSEN, JJ., concur.