THE FIRST NATIONAL BANK OF CHICAGO, Special Guardian for the Estate of Jason Toepper, a Minor, *et al.*, Plaintiffs-Appellants, *v.* G. SHERMAN PORTER, M.D., *et al.*, Defendants-Appellees.

Second District   No. 82—282

Opinion filed April 15, 1983.—Rehearing denied May 10, 1983.

James H. Canel, Ltd., and Jack Josephy, both of Chicago, for appellants.

Stanley J. Davidson, of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, H.C. Griffin, of Lord, Bissell & Brook, Wildman, Harrold, Allen & Dixon, and Clausen, Miller, Gorman, Caffrey & Witous, P.C., all of Chicago, for appellees.

JUSTICE REINHARD delivered the opinion of the court:
Plaintiffs, First National Bank of Chicago (as special guardian for the estate of Jason Toepper, a minor), Jane Toepper and Jim Toepper, appeal from a directed verdict in favor of defendant, Richard Randall Adams, M.D., at the close of plaintiffs' case and from directed verdicts in favor of all other defendants, G. Sherman Porter, M.D.,

McHenry Hospital (hospital), Ruth Miller Ramsey, R.N., and Lee Lull Ulrich, R.N., entered after a jury failed to reach a verdict. The plaintiffs' complaint alleged that all defendants committed medical malpractice during the delivery and birth of Jason Toepper on January 24, 1978, or during the treatment leading up to his delivery. They claim defendants' actions resulted in severe brain damage to Jason.

Plaintiffs raise the following issues on appeal: (1) did the trial court lack authority to enter directed verdicts after discharging the jury and declaring a mistrial; (2) did the trial court erroneously enter directed verdicts under the *Pedrick* standard; (3) did the court commit trial errors which prejudiced plaintiffs; and (4) should the trial court have directed a verdict on liability for plaintiffs.

We summarize only the facts necessary for an understanding of the issues decided. Ronald Cooker, R.N., the director of nursing services at defendant hospital, called under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 60), recodified as section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102) testified that the hospital had an obstetrical nursing manual which delineated the responsibilities of obstetrical nurses. The nurses were expected to follow the guidelines in the manual.

The manual provided that nurses were to do a vaginal pre-check examination of women who came to the obstetrical department (department) believing themselves to be in labor. The examination was to check dilation of the cervix and to determine if the woman was in active labor. The nurse was then to report the findings to a physician, who would determine whether the woman should be sent home or kept at the hospital. The purpose of this policy was stated to be the protection of the hospital, the nurses, and the patient in case something happened to the patient after she was sent home.

Cooker testified that he learned the nurses were not, in all cases, checking with a doctor before sending women home, and, that he discussed this with Dr. Porter, the chairman of the department, in the fall of 1977. Dr. Porter told him they had always done things that way and that it had never been a problem.

Plaintiffs called defendant G. Sherman Porter, M.D., under section 60. He testified he was a certified specialist in obstetrics and gynecology and chairman of the department at the hospital. In 1977 he was vice-president of the hospital's medical staff and was president of that staff in 1978.

When Dr. Porter arrived at the hospital in 1965, the nursing service had a "standing sort of thing" where a nurse would do the pre-check vaginal examination, determine if the woman was in labor, and

if she were not, the nurse would send her home. In April 1977 a new procedure, which Dr. Porter agreed to, came into effect. Under it the nurses no longer had a judgment role in deciding whether to discharge. Rather, they were to call a doctor who would make that decision. He stated that he expected the obstetrical nurses to call him day or night under this procedure, when he was the on-call physician. He testified he never told the nurses not to bother him at night.

He testified that, prior to January 24, 1978, he had provided the department with Jane Toepper's prenatal record. He said a doctor was available at all times, to be called by the department's nurses in case something that only the doctor knew about had happened between the time the prenatal report was given to the department and the time the woman came to the labor room.

Dr. Porter's standing orders called for electronic fetal monitoring for patients in labor. These orders applied to women in active labor.

Dr. Porter testified that he believed it was within the standard of care for a nurse to conduct a pre-check examination.

Defendant Ruth Miller Ramsey, R.N., testified under section 60 examination. She testified that no physician had taught her how to do vaginal pre-check examinations. She had developed her own technique. She stated that the progress of a woman's labor could be determined by performing these examinations over a period of time and by comparing the changes that occurred.

Nurse Ramsey testified she had no independent recollection of Jane Toepper's arrival at the hospital at 2:15 a.m. on January 24, 1978. Referring to the hospital record, she determined that she performed a vaginal examination on Jane Toepper at 2:15 a.m. Jane Toepper was admitted at 2:15 a.m. and discharged at 2:30 a.m. The record noted no dilation of the cervix, thick effacement (less than 50% effaced), that the baby was at zero station, and that she could not determine which part of the baby was coming down the birth canal first. She charted the fetal heart tones (FHT) as 132 per minute. She measured them by use of either a Dopp tone device or a fetoscope. She charted Braxton Hicks contractions (false labor) at 2:30 a.m. The chart indicated that Jane Toepper's membranes had been stripped on January 23, 1978. She did not call a physician before discharging her. She was unaware of nursing manual requirements that a physician be contacted before discharge.

She testified that she did not know whose handwriting appeared on the "Delivery and Newborn Record" or who wrote the Apgar scores. Apgar scores show the condition of the baby at one and five minutes after birth. A score of 10 is perfect and seven is normal. Ja-

son's scores were recorded as seven at one minute and nine at five minutes.

Plaintiffs called defendant Richard Randall Adams, M.D., under section 60. He was employed by the McHenry Medical Group, a firm of which Dr. Porter was a member.

Dr. Adams stated Dr. Porter had a verbal rule that nurses were to make admission decisions based on the vaginal examination they conducted. The written orders were contrary to this verbal understanding.

Dr. Adams first saw Jane Toepper December 27, 1977. He also saw her January 23, 1978. Up to this time the pregnancy had been uneventful. The baby was at zero station and coming into the birth canal. Jane Toepper's cervix was 80% effaced. He stripped the membranes to "enhance" delivery. He felt the baby's head through the bag of waters, and therefore knew the head was the first part of the baby to enter the birth canal. The cervix was favorable to delivery and he expected contractions would start in about 24 hours.

Dr. Adams was on call the night of January 23-24, 1978, and left a number where he could be reached. He was first contacted between 5:20 a.m. and 5:30 a.m. January 24, 1978.

He stated that only in two rare instances would a woman who was 80% effaced have a thick cervix: (1) if she was pushing against an undilated cervix; or (2) if she was having a dysfunctional labor. Both cases require the patient to be in labor. It would be important for a doctor to know if this later thickening had occurred.

When he was telephoned between 5:20 and 5:30 a.m. he was informed Jane Toepper was at plus two station (*i.e.*, the baby was making progress down the birth canal from zero station), that the bag of waters had broken, and that meconium (baby's fecal matter) was in the amniotic fluid. Meconium is a sign of possible fetal distress.

Upon his arrival at the hospital, he told Jane Toepper to push. When he examined her, he found fresh meconium. Fresh meconium meant "something acute" had happened within the previous 12 to 24 hours. With meconium present, it is important to check the FHT. He testified that if there was a change in the FHT from the onset to the conclusion of the contraction, called late deceleration, it would indicate fetal distress.

On delivery, he noticed meconium was present and that the umbilical cord was wrapped tightly around Jason's neck. This would deprive him of oxygenated blood and cause a decrease in the FHT. He stated an infant can sustain a lack of oxygen for eight to 15 minutes. He removed the cord from around Jason's neck allowing oxygenated

blood to flow through it from his mother. The meconium had not stained the skin, so it had not been there a long time.

Dr. Adams suctioned Jason's mouth so he wouldn't breath meconium. He then suctioned him again. Jason did not make as great a respiratory effort as desired, so he suctioned Jason again above and below the vocal cords. Not much meconium was found below the vocal cords.

Jason didn't cry at birth, had poor color, and didn't respond to the touching of his foot immediately, though it was less than one minute from birth before the first response from him. Dr. Adams gave Jason 100% oxygen at 40 breaths per minute for four minutes. Jason's response to the oxygen indicated he lacked adequate oxygen levels.

Dr. Adams delivered Jason at 5:56 a.m. and the placenta at 6 a.m. Jason showed continuing improvement after suctioning. Dr. Adams acknowledged the hospital records were inconsistent with his testimony in that they indicated Jason had been born at 5:45 a.m. and that Dr. Adams had arrived at 5:46 a.m. Also, the record indicated Jane Toepper had left the delivery room prior to 6 a.m. which is the time the record indicates the placenta was delivered.

Plaintiffs called defendant Lee Lull Ulrich, R.N., under section 60. She was an experienced obstetrical nurse. Nurse Ulrich was unaware of the policy in the nursing manual requiring nurses to check with a doctor before discharging a woman. The nurses always performed the pre-check and sent the woman home if they determined she was not in labor. There was a verbal understanding not to call the doctors at night.

She testified she had no independent recollection of Jason's delivery. She filled out the "Progress of Labor" chart which indicated labor began at 2:15 a.m. and that the bag of waters and fluid were meconium stained. She did not use an electronic fetal monitor to check FHT even though the standing orders provided for its use for normal patients in labor. She testified she believed checking FHT with either a Dopp tone or a fetoscope was proper under the standing orders.

At 5:15 a.m. she knew that birth was imminent. Nurse Ulrich did not know if the Apgar scores were in her handwriting.

Nurse Ulrich did not see Jane Toepper at 2:15 that morning. The records do not indicate any emergency or any fetal distress during delivery.

Plaintiff Jane Toepper testified that when she became pregnant she went to the McHenry Medical Group for obstetrical care. Her due date was January 24, 1978. She awoke at midnight on January 24 with pains. She was sure they were labor pains because they were in

a pattern and getting stronger. She went to the hospital around 2 a.m. Nurse Ramsey did a vaginal examination and sent her home saying the baby would not be born for a couple more days.

She went home, but couldn't sleep because the pains were bad. She called the hospital again and they told her to come in if it would make her feel better. A few minutes later she called again. While the phone was ringing, her bag of waters broke and she saw "green water, dark water" on the floor. She hung up before anyone answered and then went back to the hospital.

At the hospital Nurse Ramsey or Nurse Ulrich said "My God, the baby is here, it is going to be born." Nurse Ramsey then told her to blow out and not to bear down. When Dr. Adams arrived, he told her to push but she was exhausted from blowing out. She said Jason did not cry when he was born.

She testified Jason had no unusual sicknesses prior to October 27, 1978. She noticed he had a twitch on that afternoon.

On cross-examination she admitted Jason had gone to the emergency room for illnesses, once in the summer, and once in early September with a temperature of 102 or 103. She also stated he had a fever of about 103 on October 27, 1978.

Plaintiff Jim Toepper testified that when he brought his wife in after 5 a.m., Nurse Ulrich asked, "Why didn't someone wake me?" (Apparently she had been sleeping when Jane Toepper came in at 2:15 a.m.) He stated he never heard a beeping sound during the delivery (a Dopp tone used to measure the FHT would beep); that the nurses did not listen to his wife's abdomen with anything; but that Dr. Adams did listen to her abdomen.

Plaintiffs called Grace Blake and Joyce Sweeney who babysat for Jason on several occasions between March 1978 and October 27, 1978. Blake testified she was concerned since Jason would stiffen his back and cry for about 10 seconds periodically. He never grasped a bottle or rattle, or sat up, or attempted to lift himself or rollover. Sweeney stated Jason had to be propped up when she put him in a walker in October because he could not sit by himself. His head wobbled, he could not hold himself up, and he tired within 15 minutes of being placed in the walker. He could not move the walker. He never grasped toys, crawled, or sat unassisted.

August M. Rossetti, M.D., testified for plaintiffs that he was Jason's pediatrician. He saw Jason soon after birth and he appeared normal in muscle tone, color, cry, skin, and head size. His reflexes, including neurological reflexes, were normal. He saw Jason two weeks after birth and he appeared normal. He was well on March 20, 1978.

On April 3, 1978, Jason had diarrhea and a temperature of 103. He was fine up through early July when he was taken to the emergency room with a 103° temperature and a breathing problem. He was well through September 5, 1978, whereupon he had an upper respiratory infection.

On October 27, 1978, Dr. Rossetti saw Jason. He had an acute febrile (fever) illness, pharyngitis (throat infection) and transient clonus (intermittent jerking). Test results showed the presence of Hemophilus influenza. On November 2, 1978, Rossetti referred Jason to Dr. Tomasi. Dr. Rossetti's discharge diagnosis was (1) Hemophilus influenza, nasopharyngitis and (2) seizure disorder residual of birth injury. Dr. Rossetti testified he relied on Dr. Tomasi's opinion in writing this diagnosis.

Thomas W. McElin, M.D., an obstetrician, testified for plaintiffs. He testified that the 2:15 a.m. examination by Nurse Ramsey was a deviation from the nursing standard of care because it only lasted 15 minutes and true labor cannot be diagnosed in that time and because effacement had to be greater than Nurse Ramsey observed based on the prior day's action by Dr. Adams. He stated it was a deviation from the standard of care to tell Jane Toepper to blow out while waiting for the doctor.

Dr. McElin said Dr. Porter deviated from the standard of care when, as chairman of the department, he did not inform the nurses of the written procedure requiring a doctor's decision on discharging a patient, and when he failed to correct the procedure the nurses were following when he learned of it.

He stated there was a deviation from the standard of care by the nurses in not using the electronic fetal monitor during the 2:15 a.m. examination and in failing to keep Jane Toepper in the hospital with continuous fetal monitoring. He testified that the hospital, through its director of nursing services, deviated from the standard of care in failing to tell the nurses of the written policy and in failing to insure that they followed it. He testified it was a deviation from the standard of care by the obstetricians for their prenatal record not to include the fact that Jane Toepper experienced cardiac arrythmia in delivery of her other child. However, he acknowledged on cross-examination that the hospital record did contain a reference to that fact which he had not noticed before.

On cross-examination, Dr. McElin stated there was no way of knowing precisely when the meconium was passed except that it had to have been passed prior to the time of the rupture of the membrane, nor was there any test that could prove whether hypoxia oc-

curred between the onset of labor and delivery. On redirect, he indicated he believed "hypoxia is known by the amount of resuscitation that was required." He then answered "yes" to the question whether that was "evidence of hypoxia which occurred prior to birth and during the birth process." He testified he could not find any fault with the care and treatment rendered to Jane Toepper by Dr. Adams.

Lawrence G. Tomasi, M.D., a pediatric neurologist, testified for plaintiffs. He examined Jason in early November 1978. He diagnosed hypoxia ischemia (lack of oxygenated blood to the brain) occurring sometime during the birth process as the cause of Jason's problems. He said lack of sufficient blood flow would cause stress and cause meconium to be released. He testified that the birth process is always stressful for a child; that it is optimal for the child to "come out crying and screaming and pink. Anything less than that is less than optimal." Jason was less than optimal when he came out. He had greater stress than is optimal. He was "stressed sufficiently to cause everybody concern and it certainly caused some dysfunction." Dr. Tomasi testified it was "hard to say one way or another whether this caused a severe injury, but it certainly is a likely candidate for that severe injury." He stated that he and Dr. Rossetti "related both [Jason's] seizures and his delayed development to difficulties that he had in and around the time of labor and delivery." Jason has severe brain damage and will require continual care for the remainder of his life.

Plaintiffs called several other witnesses whose testimony is not material to the issues raised on appeal. After plaintiffs rested their case, a directed verdict was entered for Dr. Adams.

Defendants presented expert testimony that the injury to Jason was not caused by hypoxia at birth. Defendants called other witnesses whose testimony is not relevant to the issues raised on appeal. At the close of all the evidence, the remaining defendants moved for directed verdicts and the plaintiffs sought a directed verdict as to liability. The court reserved a ruling on all motions. The jury failed to reach a verdict and was discharged. Subsequently, verdicts were directed for all defendants.

Plaintiffs first contend that because a mistrial "vitiates all prior proceedings" the trial court was without authority to consider defendants' reserved motions for directed verdicts. We note, initially, that this argument does not go to Dr. Adams, in whose favor a verdict was directed at the close of plaintiffs' case.

Section 68.1 (2) and (3) of the Civil Practice Act recodified as amended as section 2—1202(b) and (c) of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 1202) provided, in part:

"(2) Relief desired after trial in jury cases, heretofore sought by reserved motions for directed verdict or motions for judgment non obstante veredicto, for judgment notwithstanding the verdict, in arrest of judgment or for new trial, must be sought in a single post-trial motion. Relief after trial may include the entry of judgment if under the evidence in the case it would have been the duty of the court to direct a verdict without submitting the case to the jury, even though no motion for directed verdict was made or if made was denied or ruling thereon reserved. ***

(3) Post-trial motions must be filed within 30 days after the entry of judgment *or the discharge of the jury, if no verdict is reached,* or within any further time the court may allow within the 30 days or any extensions thereof. ***" (Emphasis added.) Ill. Rev. Stat. 1981, ch. 110, pars. 68.1 (2), (3).

Plaintiffs argue that section 68.1 does not allow the trial court to grant a post-trial motion for a directed verdict after the jury has failed to reach a verdict and a mistrial has been declared where ruling on the directed verdict motion was reserved at the close of all the evidence. However, the clear intent of the statute is to allow such a post-trial motion. The Joint Committee Comments to this statute, which may be used in determining legislative intent (*People ex rel. Daley v. Moran* (1983), 94 Ill. 2d 41, 49, 445 N.E.2d 270), demonstrate such an intent. They explain these provisions as follows:

"By revised section 68.1(2), the right to judgment after trial when, under the evidence, the court would have had the duty to direct a verdict exists *whether or not the jury is able to agree on a verdict.* Accordingly, a provision has been inserted in subsection (3) to provide a time for filing post-trial motions in cases wherein no judgment on a verdict is possible because of the disagreement of the jury. The effect of subsections (2) and (3) is to continue, with slight modification, the practice authorized by the 1937 amendment to former section 68(3)a of the Act whereby a party could obtain a judgment after trial even though the jury had disagreed and was discharged without rendering a verdict." (Emphasis added.) Ill. Ann. Stat., ch. 110, par. 68.1(2), (3), Joint Committee Comments, at 33 (Smith-Hurd 1968).

Section 68.1 has been held to allow the trial court to grant judgment on a post-trial motion where the jury failed to reach a verdict. (*Upgrade Corp. v. Michigan Carton Co.* (1981), 97 Ill. App. 3d 1132, 1135, 423 N.E.2d 1277.) Similarly, we hold that the statute al-

lows the court to grant a directed verdict on a post-trial motion where ruling on the directed verdict motion had been reserved before the case went to the jury and where the jury then failed to reach a verdict. It is apparent from the Joint Committee Comments, and from the language of the statute itself, that the statute is intended to allow the trial court to take such action.

The two cases cited by plaintiffs are inapposite. In *Papageorgiou v. F. W. Woolworth Co.* (1978), 66 Ill. App. 3d 873, 383 N.E.2d 1346, the basis of the appellate court's decision was that an unbiased jury had ultimately decided the case and therefore plaintiff had not been prejudiced by the declaration of a prior mistrial granted during the selection of a different panel of jurors. In *Haywood v. Swift & Co.* (1964), 53 Ill. App. 2d 179, 202 N.E.2d 880, the appellant sought to have the trial court enter judgment based on a special interrogatory answered by the jury where the jury failed to return a general verdict and the court declared a mistrial. The appellant urged that the answer to the special interrogatory was a special verdict. The appellate court held that no authority existed to allow entry of judgment on a special interrogatory. Thus, the question whether application of the directed verdict standard entitled defendant to a directed verdict was not an issue in that case.

Plaintiffs' next contention is that the trial court erroneously applied the *Pedrick* standard when it directed verdicts for defendants. In order to properly direct a verdict, all of the evidence, when viewed in its aspect most favorable to the opponent, must so overwhelmingly favor the movant that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

In a medical malpractice action, plaintiff, by use of expert testimony, must establish the standard of care applicable to physicians and that "judged in the light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff." (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301.) A hospital is required to conform to the legal standard of reasonable conduct in light of the apparent risk, and expert testimony is essential to the proof of the standard of professional care. (*Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 662, 343 N.E.2d 589.) For the purpose of this appeal, all defendants, except for Dr. Adams, concede that sufficient evidence was presented to create a factual question for the jury whether defendants deviated from the standard of care. We, too, proceed on the basis that plain-

tiffs' evidence was sufficient to withstand a directed verdict on the issue of the defendants' deviation from the standard of care. Nonetheless, defendants contend that the directed verdicts were proper based on plaintiffs' failure to prove by expert testimony that defendants' allegedly negligent acts proximately caused Jason Toepper's injuries.

Plaintiffs respond that proximate cause is normally proved by medical evidence, but deny that "any case requires a medical expert to establish medical cause by repetition of a shibboleth or formula." They maintain that proof of causation "can be established by hypothetical questions, and by the assemblage of facts." They further contend that "once it is realized that the operative legal cause here is the *failure to make timely diagnosis* and *failure to make timely intervention*, the fact that the record in this case overwhelmingly establishes the required connection between defendants' conduct and the effect becomes manifest." Plaintiffs also argue that numerous trial errors caused by defendants "prevented the trial court from admitting evidence of cause."

■ Appellate court decisions of this State have stated that in order to recover in a medical malpractice action, a plaintiff must prove by expert testimony that defendant's breach of the standard of care caused the plaintiff's injury. (*Carman v. Dippold* (1978), 63 Ill. App. 3d 419, 425, 379 N.E.2d 1365; *Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 662, 343 N.E.2d 589; *Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill. App. 2d 461, 464-65, 235 N.E.2d 671; *cf. York v. Stiefel* (1982), 109 Ill. App. 3d 342, 350-52, 440 N.E.2d 440, *appeal allowed* (1983), 92 Ill. 2d 579.) Generally, expert testimony is needed to support a charge of malpractice because jurors are not skilled in the practice of medicine and would find it difficult without the help of medical evidence to determine any lack of necessary scientific skill on the part of the physician. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279.) We believe that rationale is equally sound and applicable to the element of causation in a medical malpractice case.

It is plaintiffs' contention that the numerous deviations from the standard of care by defendants resulted in the failure to make a timely diagnosis of Jason's distressed condition during the birth process and the failure to make timely medical intervention to prevent Jason's injury. However, it is clear from this record that plaintiffs' expert obstetrical witness only offered an opinion on the deviations from the standard of care, but no expert evidence was adduced that these deviations caused Jason's injury. The critical missing link was the lack of expert testimony that these deviations caused the injury or that the

defendants deviated from the standard of care by their failure to make a timely diagnosis of Jason's distressed condition during the birth process and that the failure to make timely intervention caused Jason's injury.

In sum, Dr. McElin testified that the defendants deviated from the standard of care. Dr. Tomasi testified that hypoxia during the birth process caused Jason's injuries. However, neither these experts, nor any other expert, testified that the deviations from the standard of care caused the hypoxia or that the defendants' failure to timely diagnose or intervene caused Jason's injury. From our examination of the voluminous record in this case, we reject plaintiffs' contention that the record "overwhelmingly establishes the required [causal] connection between defendants' conduct and the effect." To the contrary, there was no expert medical testimony of a causal connection. From our reading of the record, the medical evidence is highly technical, further illustrating the importance of the requirement of expert testimony on causation to assist the trier of fact in medical malpractice cases.

In *Carman v. Dippold* (1978), 63 Ill. App. 3d 419, 425, 379 N.E.2d 1365, plaintiff's expert testified that "[b]ased on the delivery room history *** the 10 minutes taken to deliver the aftercoming head resulted in the lack of oxygen" which caused the baby's death. No such expert testimony was presented here. In the absence of expert testimony that any act by any of the defendants could be said, within a reasonable degree of medical certainty, to have caused Jason's injuries, it would be impossible for a jury verdict in plaintiffs' favor to stand. Thus, the directed verdicts were appropriate. *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 252-53, 381 N.E.2d 279; *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

The only evidentiary errors raised by plaintiffs that we must address, which arguably bear on the issue of causation, are the trial court's limitation of plaintiffs' questioning of Dr. Tomasi about electronic fetal monitoring and limitation of their questioning of Dr. Adams as to how he would have acted had Jane Toepper's 2:15 a.m. visit been called to his attention.

Plaintiffs argue that the failure to use the monitor deprived them of documentation of the extent of Jason's fetal distress. Because of this, they argue, the court erred in sustaining objections to plaintiffs' questions "designed to explore this problem." Plaintiffs' question asked the doctor if, assuming that "a pediatric neurologist diagnosed the condition *** to be caused by a hypoxic ischemic event, which oc-

curred during labor and delivery," he had an opinion "as to whether or not fetal distress was ongoing?" Defendants' objection that the question asked the witness to assume the controlling issue in the case was sustained. In an offer of proof, the witness answered that he could not "quantify the degree of distress *** unless [he had] a way of monitoring it." He said that electronic fetal monitoring is the way you assess a baby's well-being and that if fetal distress persists, intervention would be necessary to relieve it.

■ Whether to admit evidence or not is within the sound discretion of the trial court, and the trial court's decision will not be reversed absent a clear abuse of discretion. (*Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 411, 444 N.E.2d 220; *Johnson v. Tipton* (1982), 103 Ill. App. 3d 291, 297, 431 N.E.2d 464.) An offer of proof is useful only if it demonstrates the admissibility of the evidence foreclosed by sustaining the objection. (*People ex rel. Fahner v. Hedrich* (1982), 108 Ill. App. 3d 83, 91, 438 N.E.2d 924; *Snedden v. Lavenka* (1981), 92 Ill. App. 3d 979, 985-86, 416 N.E.2d 1097.) Here, the offer of proof does not demonstrate the admissibility of the proffered evidence. Plaintiffs asked if the doctor had an opinion whether the fetal distress was ongoing. The offer of proof showed that the doctor did not know whether it was ongoing. We cannot say the trial court abused its discretion in precluding plaintiffs' witness from answering since his answer, as disclosed by the offer of proof, had no probative value. (*Laff v. Chapman Performance Products, Inc.* (1978), 63 Ill. App. 3d 297, 313, 379 N.E.2d 773.) Even if admitted, the evidence would not have affected the issue of causation. The offer of proof did not contain evidence of expert testimony which would establish that the deviations from the standard of care were the cause of Jason's injury.

Plaintiffs also argue that it was error to bar as speculative Dr. Adams' testimony concerning what he would have done had he been notified before Jane Toepper's discharge of the results of the 2:15 a.m. examination conducted by Nurse Ramsey. Plaintiffs contend this ruling excluded evidence of cause. However, the offer of proof discloses that Dr. Adams' testimony on this point does not bear on the issue of causation.

In the offer of proof, Dr. Adams stated that since the nurse's finding would have been in conflict with his earlier examination, he "very likely" would have recommended that Jane be kept at the hospital. He would have had the nurse walk Jane, take FHT about every 15 minutes, and recheck her in half an hour or an hour. Plaintiffs then read a portion of Dr. Adams' deposition which indicated that he had

previously stated he "probably would have come in."

■ This offer of proof shows that the precluded testimony dealt only with the actions Dr. Adams would have taken or actions he would have instructed the nurse to take. It is not an opinion that the failure to notify him was the cause of Jason's injury. Accordingly, while the testimony may have been relevant to further show the nurses' deviation from the standard of care, its exclusion was not prejudicial to the plaintiffs' proofs on causation. See *Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 559, 356 N.E.2d 779.

■ In addition to the plaintiffs' failure to establish causation. Dr. Adams argues that the directed verdict in his favor was correct because no expert testimony indicated he deviated from the standard of care. Plaintiffs' expert's testimony that failure to include Jane Topper's arrhythmia on the prenatal record sent to the hospital was a deviation from the standard of care was shown to lack a basis in the evidence when Dr. McElin acknowledged that a notation of heart "murmurs" was on the prenatal record. He further testified that he could not find any fault with the care and treatment of Jane Toepper by Dr. Adams. Therefore, the directed verdict in favor of Dr. Adams was proper because of the lack of expert testimony that he deviated from the standard of care (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301), as well as for the failure to prove causation.

In view of the correctness of the trial court's ruling on all the defendants' motions for directed verdict, it was, of course, proper to deny plaintiffs' request for a directed verdict on liability.

For the foregoing reasons we affirm the directed verdicts entered in favor of defendants.

Affirmed.

SEIDENFELD, P.J., and UNVERZAGT, J., concur.