David STEWMAN; Jerry Inman, husband; Verna Inman, wife; Inman Auto Sales, Inc.; Kenneth Stallsworth, husband; Maria Stallsworth, wife; Dennis Gordon, husband; Margaret Gordon, wife, Plaintiffs-appellants,

v.

MID–SOUTH WOOD PRODUCTS OF MENA, INC., Defendants-appellees.

B & F Engineering, Inc.; Rollins Environmental Services, Inc., Defendants.

Ehlco Liquidating Trust, Defendants-appellees,

Dale Rogers, Defendant.

Oklahoma Toxics Campaign, Amicus Curiae.

No. 92–2968.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1993.

Decided May 20, 1993.

Rehearing Denied June 24, 1993.

See also 784 F.Supp. 611.

Robert Ridgeway, Hot Springs, AR, argued, for plaintiffs-appellants.

Paul K. Holmes, III, Fort Smith, AR, argued, for defendant-appellee, Ehlco.

William P. Thompson, Fort Smith, AR, argued (Richard L. Spearman, on the brief), for defendant-appellee, Mid–South Wood.

Before McMILLIAN, MAGILL and LOKEN, Circuit Judges.

McMILLIAN, Circuit Judge.

Appellants [1] appeal from a final judgment entered in the United States District Court for the Western District of Arkansas,[2] in favor of appellees, Mid–South Wood Products of Mena, Inc. (Mid–South), and the Ehlco Liquidating Trust (Ehlco). *Stewman v. Mid–South Wood Products of Mena, Inc.*, No. 91–2047, slip op. at 46, 1992 WL 489729

---

1. David Stewman; Jerry Inman and Verna Inman; Inman Auto Sales; Kenneth Stallsworth and Marla Stallsworth; Dennis and Margaret Gordon.

2. The Honorable Jimm L. Hendren, United States District Judge for the Western District of Arkansas.

(W.D.Ark. July 28, 1992) (*Stewman*). Appellants sought damages for diminution in property values due to environmental pollution and response costs. For reversal, appellants argue the district court erred in finding (1) there had been no release of a hazardous substance on appellants' property and (2) appellants' costs were not recoverable response costs. As detailed below, we affirm the judgment of the district court.

Appellants are owners of property near a wood treatment facility now owned by Mid–South located in Mena, Arkansas. The facility was developed originally in the 1930's by Nebraska Bridge Supply & Lumber Co. to treat posts and poles. It was purchased by Edward Hines Lumber Co.[3] in 1967 and was used to pressure treat lumber using both pentachlorophenol (PCP) and creosote processes. In 1977, Ehlco changed to a pressure-treating process using chromium copper arsenate (CCA). In 1978, Ehlco sold the site to Mid–South, which continues to operate the facility using the CCA process. Mid–South has never used PCP or creosote in any of its processes.

In 1976, there was a fish kill in two streams in Mena, Arkansas. A state fish and game officer traced the fish kill to the "Old Pond," a pond located on the site which had been used to collect and store PCP and creosote sludge from the treatment process. In 1981, the state environmental agency began investigating the site and found substantial quantities of hazardous substances, including chromium, arsenic, and PCP. In 1982, the site was added to the National Priorities List (the Superfund cleanup list). The Environmental Protection Agency (EPA) studied the site and adopted a remedial plan. EPA sued Mid–South and Ehlco to force them to clean up the site. Mid–South and Ehlco entered into a consent decree under which they agreed to perform the necessary cleanup. *United States v. Edward Hines Lumber Co.*, No. 88–249 (W.D.Ark. May 16, 1987).

The consent decree identified the portion of the facility where there was contamination as the Superfund site or cleanup site. The remainder of the facility was not part of the Superfund site and is referred to as the Mid–South site. Ehlco hired B & F Engineering, Inc., as consulting environmental engineer and project director, and Rollins Environmental Services, Inc., to perform the actual cleanup work. The remedial action outlined by EPA involved the excavation of all contaminated soil within the Superfund site and its placement in two mounds on the Mid–South site. The mounds were "capped" with impermeable clay, sand, top soil, and sod. Subsurface drains were installed around the mounds to collect subsurface water, which is collected and pumped to an on-site water treatment plant for treatment.

Water from the treatment plant is discharged into an unnamed tributary of a creek on the west side of the Mid–South site. The state environmental agency has issued discharge permits to the water treatment plant ("001 outfall"). The discharged water flows through an open ditch where other surface drainage water joins it ("002 outfall"). The water then drains across the Mid–South site to the southwest. The 001 and 002 outfalls are sampled and tested weekly for PCP and twice a month for arsenic and chromium. In September 1989, EPA issued its Interim Closeout Report which found that all remedial activities had been completed in accordance with the Record of Decision (the cleanup plan). The site will continue to be monitored for 30 years and periodic testing is required.

David Stewman owns about 4 acres off the highway; he operates a mail order auto parts business on the property. His property is surrounded on three sides by the Mid–South site. A small ditch crosses his property from west to east and carries surface drainage water from an area north of the highway. The water in the ditch is monitored where it crosses the Mid–South site. Jerry Inman and his family own about 8 acres south of the Mid–South site; Jerry Inman operates a used car lot on the property and his son and daughter-in-law live on the property. No water drains off the Mid–South site onto their property. Inman alleged that his property was contaminated by dust during the cleanup process. Dennis Gordon and his

3. The Ehlco Liquidating Trust (Ehlco) is the successor to Edward Hines Lumber Co.

family own about 6 acres west of the Mid–South site; Gordon alleged that Mid–South had in the past pumped waste creosote onto the ground and contaminated the groundwater. He does not claim contamination due to drainage water or dust. Kenneth Stallsworth and his family own property across the highway from the Mid–South site and alleged water and soil contamination.

Some two years after the cleanup was completed, appellants filed this action in federal district court against Ehlco, Mid–South, Dale Rogers, EPA, and Law Engineering, Inc., alleging that the cleanup had not been successful and that their properties were and are contaminated by PCP, creosote, chromium, copper, and arsenic from the Superfund site. Appellants sought damages for the diminution in property value, response costs under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), as well as pendent state claims for negligence and trespass. The district court granted summary judgment in favor of Rogers and EPA, and appellants dismissed their claims against Law Engineering, Inc.

Appellants hired DeWain Tennant, of Ciaira, an environmental consulting firm, to conduct tests of their properties. Tennant took samples of dust inside and outside structures on the properties. According to Tennant, the samples showed levels of PCP, arsenic, chromium, and copper in excess of a natural amount, although at trial Tennant could not identify what constituted a natural amount. Tennant also found excessive PCP in the Stewman ditch. Appellants spent a total of $109,106.68 for attorney's fees, testing and engineering services, and environmental testing services.

Ehlco and Mid–South also presented expert testimony. Ludwig John Barinka, an environmental engineer employed by EPA from 1984 to 1991, was the EPA project manager for the Mid–South site. He testified that the site had been cleaned up and that the test levels at the 4 testing sites on the Mid–South site were all within limits of the Safe Drinking Water Act. Dr. Raymond Dean Harbison, a toxicologist, testified that chromium, copper, and arsenic, unlike PCP, are naturally occurring substances and are found in the water and soil. Dr. Harbison testified that in his opinion there had been no release or threat of release of PCP, chromium, copper, or arsenic from the Mid–South site.

Appellants' common law claims for negligence and trespass were tried to a jury, which found in favor of Ehlco and Mid–South. Consistent with the jury verdict, the district court found no negligence and no release or threatened release of hazardous substances from the site. *Stewman,* slip op. at 43. The district court credited the testimony of appellees' expert witness Dr. Harbison. *Id.* at 44. In view of the finding of no release or threat of release, the district court noted that it was not necessary to determine whether appellants' costs were response costs, but decided that, even if there had been a release and cleanup, appellants had failed to prove that their claimed costs or response actions were consistent with the National Contingency Plan; therefore, the costs were not recoverable as response costs under CERCLA. *Id.* at 44–46. This appeal followed. Although the evidence at trial involved both contamination by dust and in the water, appellants' arguments on appeal involve only water contamination.

There are four elements to a private party claim for response costs under CERCLA: (1) the defendant must fall within one of four categories of "covered persons," 42 U.S.C. § 9607(a); (2) there must have been a "release or threatened release" of hazardous substance from the facility, *id.* §§ 9607(a)(4), 9601(14), (22); (3) the release or threatened release must "cause the incurrence of response costs" by the plaintiffs, *id.* § 9607(a)(4); and (4) response costs must be the necessary costs and consistent with the National Contingency Plan. *id.* §§ 9607(a)(4)(B), 9601(23)–(25); *see also Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir. 1989). In the present case, it is not disputed that Ehlco and Mid–South are "covered persons" and thus potentially liable for response costs.

■ Appellants argue the district court clearly erred when it found that there had been no release or threat of release of haz-

ardous substances from the Mid–South site. Appellants argue it is undisputed that the Mid–South site has been and is the repository for waste products from wood processing, specifically, creosote compounds, PCP, and CCA. They further argue that all of these substances have been "released" into the environment from the Mid–South site and have migrated off the site by means of ground water, surface water and air-borne dust. Appellants contend that water samples taken from the Mid–South site contain PCP, arsenic, and chromium and that the district court erred in finding there had been no release or threat of release because the test levels were lower than the test levels in the Safe Drinking Water Act. Appellants admit the test levels are low, but they argue that under CERCLA there is no minimum quantitative requirement for a release of a hazardous substance, that is, any release of a substance on the List of Hazardous Substances (or other federal or state environmental standard) violates CERCLA as a matter of law.

Ehlco and Mid–South agree that there is no minimum quantitative requirement for a release of hazardous substances, but argue a "factual inquiry" is required in order to determine whether the particular hazard justified any response action and therefore "caused" the incurrence of response costs. *See, e.g., Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669–70 (5th Cir.1989) (*Amoco*); *see also United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 259 (3d Cir.1992) (*Alcan*). Mid–South argues that regardless of *Amoco,* there can be no CERCLA liability unless some quantitative level has been reached, posing a threat to the public or the environment. Mid–South argues appellants failed to prove that the substances came from the Mid–South site as opposed to nature because chromium, copper, and arsenic occur naturally. Ehlco argues there is no CERCLA liability for cleaning up naturally occurring substances or for discharges pursuant to state or federal permits, which, it argues, is what occurred here.

 We review the district court's factual finding that there was no release or threat of release to see if it is clearly erroneous. *Rogers v. Masem,* 788 F.2d 1288, 1292 (8th Cir.

1985). The district court credited the testimony of expert witness Dr. Harbison and found the methodology of appellants' expert to be suspect. *Id.* at 19. The district court adopted Dr. Harbison's view that no release of hazardous substances from the Mid–South site had occurred and that there was no threat of such a release. *Id.* at 44. After a careful review of the record, we hold the district court's finding of no release or threat of release is not clearly erroneous.

We agree with the holding in *Amoco* that there is no minimum quantitative requirement to establish a release or threat of a release of a hazardous substance under CERCLA. *Amoco,* 889 F.2d at 668–69; *see also Alcan,* 964 F.2d at 259. In *Amoco,* the court found that there had been a release because defendant had disposed of hazardous substances on the property and gas was emanating from the hazardous substances. 889 F.2d at 668–69. In *Alcan,* the parties stipulated that there had been a release. 964 F.2d at 259, n. 9. In the present case, unlike *Amoco* and *Alcan,* the issue was whether or not there had been a release at all.

In view of our holding that the district court's finding that there had been no release or threat of release, we need not reach appellants' second issue. Accordingly, the judgment of the district court is affirmed.