The NUTRASWEET COMPANY
& Monsanto Company,
Plaintiffs,

v.

X–L ENGINEERING CORPORATION,
& Paul R. Prikos, individually,
Defendants.

No. 95 C 6024.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 7, 1996.

Andrew Richard Running, Douglas Brian Drysdale, Kirkland & Ellis, Chicago, IL, for NutraSweet Company and Monsanto Company.

Emund B. Moran, Jr., Schopf & Weiss, Chicago, IL, for X–L Engineering Corporation and Paul R. Prikos.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court is Plaintiffs' Motion for Summary Judgment. For the following reasons, the motion is granted as to liability and denied as to damages.

### I.

Plaintiff NutraSweet Company and its parent company, Monsanto Company (collectively, "NutraSweet"), claim that Defendant X–L Engineering Corporation ("X–L") and its president and majority owner, Paul Prikos [1] ("Prikos"), illegally "dumped" toxic chemicals which eventually migrated to, and polluted, NutraSweet's land. According to Nutra-Sweet, the dumping violated two sections of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), specifically 42 U.S.C. §§ 9607(a) & 9613. X–L also requests relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and claims that the results of the "dumping" amounted to common law nuisance, tortious trespass, and negligence.

NutraSweet and X–L are neighbors. The X–L facility, an aerospace machine-part manufacturing plant, abuts the eastern property line of NutraSweet's own manufacturing plant. NutraSweet manufactures food-grade products. Unused railroad tracks on unpaved land separate the adjacent properties.

The pertinent chain of events began in October 1990, when NutraSweet contracted for a geotechnical investigation of the east side of its property bordering the X–L facility. The investigation revealed that, of the seven soil borings taken at the site, one soil boring located along NutraSweet's northeast property line emitted a "strong petrochemical odor." A year later, in October 1991, NutraSweet conducted a subsurface investigation of the same area. Soil and groundwater samples from the eastern portion of NutraSweet's property exposed high levels of chlorinated volatile organic compounds ("VOCs"). Also in October 1991, Nutra-Sweet contracted for a "Phase I" environmental assessment to determine the cause of the soil and groundwater contamination of the eastern portion of NutraSweet's land. The assessment identified X–L as a potential source of the contamination.

During the spring of 1992, a NutraSweet employee observed an X–L employee dumping a mop-bucket of liquid several times a day into a standing pool of water located at the northwestern corner of the X–L facility. On April 2, 1992, NutraSweet again collected soil and groundwater samples from the location where X–L's employee dumped the liquid and from the adjacent portions of its own land. Analysis of these samples revealed

---

1. Prikos owns 90% of the issued and outstanding shares of X–L stock.

chlorinated VOCs and other VOC contamination at the northeastern portion of the Nutra-Sweet property, as well as contamination at the site where the X–L employee dumped the liquid.

As a result of its findings, NutraSweet conducted a month-long video surveillance (from April 20, 1992, until May 21, 1992) of the NutraSweet/X–L border. The videotape establishes that an X–L employee dumped mop-buckets of liquid at the northwestern corner of the X–L facility on eighty-two occasions in a single month period. Each of the "dumps" took place on an unpaved portion of X–L property. It appears from the video-tapes that, on each of the eighty-two occasions, an X–L employee dumped the liquid into or around a standing pool of liquid. On at least four occasions, the standing pool of liquid extended from the X–L facility to the NutraSweet property. The dumps took place on twenty different days and occurred as frequently as seven times per day.

On April 28, 1992, the Illinois Environmental Protection Agency ("IEPA") and the Illinois State Police ("ISP") conducted their own joint investigation. The report of the investigation read, in pertinent part:

On April 28, 1992, [the IEPA and ISP] conducted a surveillance outside the subject site ... At 1001 hr., we observed the following: a [white male], 20's, approximately 5′6″, brown hair, glasses, slight limp, wearing a blue baseball cap, blue jacket and blue pants, wheeled a mop bucket out of the south door of the facility and pushed the bucket to the west of the facility parking lot. Then the subject emptied the contents of the bucket, a milky brown liquid, onto the ground west of the parking lot near a railroad spur. The subject then wheeled the bucket back into the south door and closed the door. [The state police officer] and I had witnessed the same sequence of events involving the same subject on April 24, 1992 at 1251 hr. ... [The ISP officer] and I drove around the block and parked at Mulford Street and Merrimac Street. I walked the [railroad] spur north from Merrimac until I reached the dumping area. I observed the same milky brown liquid on the ground

as that which the subject had dumped from the bucket moments earlier. I collected a 3 × 6 oz. soil sample from the dumping area and photographed same.

Test results of the soil sample exhibited chlorinated VOCs and other VOCs which are byproducts of chlorinated solvents. The VOCs include 1,1,1–trichlorethane ("1,1,1–TCA"), trichlorethylene ("TCE"), tetrachloroethylene ("PCE"), cis–1,2–dichloroethylene, 1,1–dichloroethylene ("1,1,1–DCE"), bis (2–ethylhexyl) phthalate, methylene chloride, acetone, toluene, xylene, and ethyl benzene. Also in the spring of 1992, the NutraSweet Plant Manager observed several fifty-five-gallon barrels stored outdoors at the X–L facility. The barrels bore a "CarboChlor" label. CarboChlor is a chlorinated solvent made up of at least 90% 1,1,1–TCA.

On July 16, 1992, IEPA and ISP investigators conducted another surveillance of the X–L facility. The report of the surveillance stated that the investigators observed, on several occasions, an X–L employee dumping a mop-bucket of liquid onto the ground near the northwest corner of the NutraSweet property. The investigators detained the employee, and collected a sample of the liquid in the bucket. A subsequent IEPA analysis of the sample detected chlorinated VOCs and other VOCs.

Also on July 16, 1992, the IEPA and ISP officers met with Prikos. Prikos informed the investigators that X–L generated three different waste streams: (1) a waste stream consisting of 1,1,1–TCA from cleaning parts; (2) a water solubale cutting oil/cooling stream; and (3) a mineral spirits stream. Prikos told the investigators that of the thirty-five fifty-five gallon drums, thirteen of them contained 1,1,1–TCA, and twenty-two contained waste coolant/cutting oil. The investigators requested samples from the drums, but Prikos refused. Also during the meeting, Prikos identified the X–L employee who allegedly dumped "mopped-up liquids" as Lee Krause ("Krause"). Krause, a mentally challenged employee, was not responsible for handling, storing, transporting, or disposing wastes. Krause's sole responsibility was to mop the floor. Prikos states that, if Krause did dump the liquids, the dumping

was without his direction or knowledge. According to Prikos, he then instructed Krause not to dispose of the mop water and that no such "dumping" occurred after that date. Further, Prikos states that X–L pays a separate company to dispose properly all hazardous substances.

In August 1992, the NutraSweet Plant Manager met with Prikos at the X–L facility. Prikos again identified the potential "dumper" as Krause, and informed the Plant Manager of Krause's mental handicap. A short time after this meeting, NutraSweet formally demanded that X–L cease and desist the contamination of its property. NutraSweet also demanded reimbursement for the associated cleanup costs. X–L denied contaminating the property and refused to reimburse NutraSweet any money.

In September 1992, NutraSweet hired a consulting firm, Geraghty & Miller ("G & M"), to conduct a soil and groundwater quality investigation at the NutraSweet property. G & M installed seven groundwater monitoring wells and collected several soil samples. Analysis of the soil samples revealed contamination by chlorinated VOCs and other VOCs. The highest concentrations of chlorinated VOCs were detected at the northeastern corner of the NutraSweet property, the area nearest where X–L dumped its mop-buckets of liquids. Moreover, analysis of a subsequent groundwater sample, taken on October 5, 1992 from the monitoring well located at the northeastern corner of the property, revealed extremely high levels of groundwater contamination by chlorinated VOCs.

In July 1993, NutraSweet began the long process of cleaning the soil and groundwater contamination. G & M and NutraSweet determined that the use of an air sparging/vapor extraction system ("AS/VE System") would be the most effective method to remediate the groundwater and soil contamination from the existence of chlorinated VOCs and other VOCs. Therefore, G & M designed and installed the AS/VE System, which consists of seventy-nine air sparge wells and a horizontal vapor extraction system. NutraSweet applied for and was issued the necessary permits from the IEPA, and

began operating the AS/VE System in September 1993.

In August 1993, NutraSweet entered into a Review and Evaluation Service Agreement ("Agreement") with the IEPA for the cleanup of the contamination at the NutraSweet property. Pursuant to the Agreement, NutraSweet agreed to: (1) submit a work plan to the IEPA for actions at the site; (2) allow for or otherwise arrange a site visit or other site evaluation by the IEPA; (3) perform work required by the IEPA; (4) pay all laboratory and analytical testing fees incurred by the IEPA; and (5) pay all other reasonable costs associated with the IEPA's involvement with NutraSweet. After the initial startup of the AS/VE System, NutraSweet personnel recorded the operating parameters twice daily for the first eleven weeks. NutraSweet employees also collected air samples each week for the first two months. Air samples taken before the air entered the AS/VE System consistently showed the existence of chlorinated VOCs.

In October 1993, NutraSweet sold property at issue to Rich Products. By agreement with Rich Products, NutraSweet continued to operate and pay for the AS/VE System until June 1996.

Also in October 1993, G & M installed four additional groundwater monitoring wells. The wells were designed to monitor the groundwater conditions during the site cleanup and were positioned in accordance with IEPA directives. In December 1993, pursuant to the Agreement, the IEPA established cleanup objectives. G & M collected groundwater samples on eight different occasions, from December 2, 1993, until July 17, 1995, from the four additional groundwater monitoring wells. Each of the thirty-two samples revealed chlorinated VOCs at levels above the IEPA's cleanup objectives. The highest chlorinated VOC concentrations were typically detected in the northeast corner of the NutraSweet property. In fact, the December 2, 1993, sample at MW–8, the monitoring well closest to the X–L "dumping" location, showed total VOCs at 49,100 ppb, compared to the three other well samples revealing VOC levels of 2,590 ppb, 1,670 ppb, and 2,060 ppb.

Since the startup of the AS/VE System, NutraSweet removed approximately 155 pounds of total chlorinated VOCs from the soil and groundwater at the NutraSweet property. The AS/VE System operated continuously from the date of startup until June 1996. Since October 1990, NutraSweet incurred costs of $64,867.81 to investigate the contamination of its property. Moreover, NutraSweet incurred total costs of $495,281.82 to clean the contamination at the NutraSweet property. The AS/VE System operated through June 1996. Thus, NutraSweet incurred a total of $560,149.63 to investigate and cleanup its contaminated property.

NutraSweet did not use chlorinated solvents, which contain chlorinated VOCs, in its food manufacturing processes. NutraSweet did, however, use a chlorinated solvent to clean finished parts in 1991 and 1992. Yet, the Safety–Kleen parts cleaner, which uses the chlorinated solvents, is a self-contained system which houses and retains seven gallons of solvent. NutraSweet operated the system indoors and periodically sent used solvent to the system's designer for recycling. No leaks, spills, or other releases of chlorinated solvents from the Safety–Kleen parts cleaner occurred at the NutraSweet property. Moreover, there is no evidence of any release of chlorinated or other VOCs onto the NutraSweet property from any on-site location.

In support of its motion, NutraSweet submits the affidavit of Robert J. Smith ("Smith"), a Project Engineer with G & M. In Paragraph Seventeen of his affidavit, Smith states:

Based upon my personal involvement with the NutraSweet Property project and my review of the materials submitted by NutraSweet in support of its Motion for Summary Judgment, it is my opinion that the VOC contamination at the NutraSweet Property identified in Geraghty & Miller's investigation was caused solely by the release of chlorinated VOCs and other VOCs from 6150 West Mulford Street in Niles, Illinois ("X–L Facility") resulting from the dumping of chlorinated VOCs and other VOCs by persons from the neighboring X–

L Facility. This opinion is supported by the following:

A. X–L used chlorinated VOCs and other VOCs in its operations at the X–L Facility;

B. X–L dumped mop-buckets of chlorinated VOCs and other VOCs at and near the northeast corner of the NutraSweet Property on many occasions, as evidenced by NutraSweet's video surveillance tapes recording X–L's dumpings on 82 different occasions, IEPA's investigative reports regarding X–L dumpings, NutraSweet's eyewitness accounts of X–L's dumpings and sampling results of the liquids dumped and of the soils and liquids at and near the dumping area;

C. the chlorinated VOCs and other VOCs contaminating the NutraSweet Property identically match the VOCs detected from samples collected by IEPA in the dumping area;

D. the soil and groundwater sampling results reveal that the highest concentrations of chlorinated VOCs at the NutraSweet Property are at the northeast corner of the property, nearest the area where X–L dumped its mop-buckets of liquids;

E. prior to operating the AS/VE System, the groundwater beneath the NutraSweet flowed in a south, south-westerly direction based on the results of Geraghty & Miller's investigation;

F. the locations where X–L dumped its mop-buckets of liquids is hydraulically upgradient from the VOC contamination at the NutraSweet Property indicating that the VOCs released at the dumping locations migrated to and contaminated the affected areas at the NutraSweet Property as a result of the groundwater flow;

G. the VOC-contaminated groundwater at the NutraSweet Property spread contamination to the soils at the NutraSweet Property by saturating soils located permanently below the shallow groundwater table and periodically

saturating other soils during fluctuations of the groundwater table;

H. to my knowledge, NutraSweet did not use chlorinated VOCs in its manufacturing processes and did not release any VOCs to the NutraSweet Property; and

I. to my knowledge, no other source except the X–L Facility released chlorinated VOCs or other VOCs to the NutraSweet Property.

NutraSweet also offers the affidavit by James A. Hill ("Hill"), a Principal Hydrogeologist with G & M. Hill agrees with Smith, and states that Smith's conclusions "are wholly supported by the analytical results, hydrogeologic data, videographic documentation and testimonial evidence related to the NutraSweet Property." Hill opines that "the VOC contamination at the NutraSweet Property was caused solely by the release of chlorinated VOCs and other VOCs from [the X–L Facility] resulting from the dumping of chlorinated VOCs and other VOCs by persons from the neighboring X–L Facility."

In opposition to the motion, X–L and Prikos offer a counter affidavit of Richard G. Shepherd ("Shepherd"). Shepherd, a principal and senior manager in an environmental consulting firm and a professional engineer, dissents from the opinions of Hill and Smith. Shepherd opines that the "technical materials submitted by Plaintiffs in support of the motion for summary judgment fail to prove, through a degree of scientific certainty, that X–L Engineering Company was the cause of contamination found on the NutraSweet Property, much less the sole cause." In support of his opinion, Shepherd states: (1) that the fact that X–L used chlorinated solvents that contained VOCs does not provide a chemical "fingerprint" to support the opinions of Hill and Smith; (2) that the VOCs come from "common chemical constituents in solvents used in manufacturing/industrial settings in the United States;" (3) that railroads historically used chlorinated solvents for weed control near tracks, rails and rights-of-way; (4) that the method of taking soil samples is not a proper method to conclude the causation between the alleged "dumping" and the pollution; (5) that a "general proximity between the 'dumping area' and an area known to be subject to contamination does not scientifically suggest that the contaminants dumped caused the contamination in [NutraSweet's] soils and groundwater"; (6) that, contrary to the Hill and Smith affidavits, the groundwater flowed at a south or south, southeasterly direction; and (7) that numerous other potential sources for the contamination on the NutraSweet property existed, including prior practices by the railroad operator, industrial contamination from neighbors of NutraSweet's property other than X–L, possible railcar spills, property uses by the prior possessors of the NutraSweet property, and the possibility of leaking underground storage tanks unknown to X–L and NutraSweet.

## II.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of submitting affidavits and other evidentiary material which show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Yet, once a movant meets the initial burden, the burden shifts to the non-movant to present "appropriate evidence demonstrating that there was a pending dispute of material fact." *Adler v. Glickman*, 87 F.3d 956, 959 (7th Cir.1996). In order to meet this burden, the nonmoving party may not simply rely on "mere allegations" that a genuine issue of fact exists; it must counter the evidence submitted by the movant by providing "materials of evidentiary quality" to create material factual issues. *Id.* Presenting merely a scintilla of evidence will not suffice to oppose a motion for summary judgment, *Associated Milk Producers, Inc. v. Meadow Gold Dairies*, 27 F.3d 268, 270 (7th Cir.1994); a non-

movant must raise more than a "metaphysical doubt" concerning the existence of a genuine issue of fact. *Walker v. Shansky,* 28 F.3d 666, 671 (7th Cir.1994).

## III.

■ In its response to the instant motion, X–L argues that NutraSweet lacks standing to bring the lawsuit. Standing requires a showing of (1) an injury in fact, (2) a causal connection between the injury and the action by defendants, and (3) a likelihood that a favorable decision will redress the wrong alleged. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). X–L bases its lack-of-standing argument on two grounds: first, that NutraSweet sold and assigned all of its assets to Monsanto; and second, that neither Monsanto nor NutraSweet currently own the property at issue. Both grounds lack merit.

First, that NutraSweet sold the entirety of its assets to Monsanto is of no practical consequence. Monsanto is also a plaintiff to this action and now possesses all legal rights once held by NutraSweet. NutraSweet is, and at all relevant times has been, a wholly-owned subsidiary of Monsanto. Second, that Rich Products now owns the property at issue is also irrelevant. Although NutraSweet sold the property to Rich Products, both NutraSweet and Rich Products agreed that NutraSweet would continue to fund the operation of the AS/VE system. This is an injury in fact, and this injury satisfies the first standing requirement. Further, CERCLA provides NutraSweet and Monsanto with standing: § 107(a) allows private companies to sue alleged violators of CERCLA. 42 U.S.C. § 9607(a). Thus, the court overrules X–L's objection regarding standing, and entertains the motion in its entirety.

## IV.

### A. Count I—CERCLA Section 107(a)

NutraSweet first charges X–L with violations of CERCLA § 107(a). NutraSweet may prevail if it establishes (1) that X–L's manufacturing site is a "facility" as defined by § 101(9); (2) that X–L and Prikos are responsible persons under § 107(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release caused the NutraSweet to incur response costs. *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 325 (7th Cir.1994). If NutraSweet establishes each of these elements and X–L is unable to establish the applicability of one of the defenses listed in § 9607(b),[2] then NutraSweet is entitled to summary judgment on the liability issue, even when there is a genuine issue as to appropriate damages. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989).

■ First, X–L's manufacturing site was a "facility" as defined in CERCLA. A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(B). The term "hazardous substance" encompasses any "element, compound, mixture, solution, or substance" designated by the United States Environmental Protection Agency ("USEPA"). 42 U.S.C. §§ 9601(14)(B), 9602. The list of "hazardous substances" designated by the USEPA includes 1,1,1–TCA, TCE, PCE, 1,2–dichloroethylene, 1,1–dichloroethylene, methylene chloride, acetone, toluene, xylene, and ethylbenzene. *See* 40 CFR 302, Table 302.4. X–L admits that it stored at least thirteen fifty-five gallon drums of CarboChlor, which contains 90% 1,1,1–TCA, at its site. Moreover, soil samples taken by the IEPA reveal the presence of 1,1,1–TCA and the remainder of the above list of substances defined as "hazardous" by the USEPA. Thus, the court finds not only that X–L stored a "hazardous substance," but that other hazardous substances "otherwise came to be located" on the land. Accordingly, the court finds the X–L property to be a "facility" as defined by CERCLA.

---

**2.** To establish a defense to liability, a defendant must prove by a preponderance of the evidence that the release or threat of a release of a hazardous substance and the resulting damages "were caused solely by—(1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party...." 42 U.S.C. § 9607(b).

**1418**

█ Further, the NutraSweet property is a "facility" as well. Soil and groundwater samples taken at the NutraSweet property reveal the presence of many of the above "hazardous substances." Thus, since the substances "came to be located" on Nutra-Sweet land, the property is a "facility" under CERCLA.[3]

' Second, NutraSweet contends that both X–L and Prikos are "responsible persons" under CERCLA. The court agrees. A "responsible person" includes "owners," "operators," and "arrangers" of hazardous substance disposal. 42 U.S.C. § 9607(a).

█ NutraSweet argues that Prikos meets all three types of "responsible persons": according to NutraSweet, Prikos owned the facility, operated the facility, and arranged the method of disposal. The court first finds that Prikos does not own the X–L facility. While the Cook County Tax Assessor's records show that Prikos is the "taxpayer" of the land, a trust deed submitted by Prikos shows that beneficial title is held not by Prikos, but by the 6150 Mulford Limited Partnership, and that the Manufacturers Affiliated Trust Company is the trustee of the property. Thus, for summary judgment purposes, Prikos is not the owner of the X–L facility.[4]

█ The court also finds that Prikos is not the "operator" of the facility. A majority shareholder and corporate officer is an "operator"—and thus subject to CERCLA liability—when he or she "has knowledge of an activity and the duty and power to prevent it," but acquiesces. *Sidney' S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir.1994).

Without such direct, personal involvement, the corporation and not the associated individuals must be regarded as owning or operating the . . . sit in question. It would certainly be unreasonable to infer simply from general allegations of corporate ownership or operation of a . . . site that individuals acting on the corporation's behalf are themselves liable.

*Id.* at 421–22. General corporate authority or supervisory capacity is not enough; active participation in, or exercise of specific control of, the activities in question must be shown. *Id.* at 422. Here, Prikos did not actively participate in Krause's mop-bucket-dumping activity. According to Prikos' statements, which the court must accept as true since no contrary evidence exists in the record, Prikos had no personal knowledge of Krause's activities other than Krause's single chore—to mop the building floor. No evidence exists to show that Prikos knew of the activities but neglected to stop Krause from continuing the activities. Instead, the only evidence in the record reveals that Prikos was unaware of the mop-bucket dumping until notified of it by the IEPA and ISP. After such notification, Prikos directed Krause to cease such behavior. Thus, the court finds that Prikos did not actively participate, i.e. had no personal involvement, in the supposed CERCLA-violating activity. *See CBS, Inc. v. Henkin,* 803 F.Supp. 1426, 1436 (N.D.Ind.1992) (holding that, like the instant case, the fact that a defendant owned over 90% of the corporation stock does not, in-and-of-itself, establish · liability). Consequently, Prikos cannot be liable as an "operator" under CERCLA for the actions of X–L or its employees.

█ NutraSweet finally contends that Prikos is an "arranger" for the disposal of hazardous substances and, thus, is subject to CERCLA liability. CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), imposes strict liability upon "any person" who arranged for the disposal or transportation for disposal of hazardous substances. As defined by statute, the term "person" includes both individuals and corporations and does not exclude corpo-

---

**3.** The court notes that the instant case is an unusual one. In the case *sub judice,* NutraSweet alleges that X–L "dumped" the hazardous substances on its own property. Yet, the substances moved by way of surface water and groundwater onto the NutraSweet property. Thus, while in most cases a single "facility" inquiry is necessary, the court finds important the fact that both

properties at issue meet the CERCLA definition of "facility."

**4.** NutraSweet consistently contends that Prikos is the "sole owner" of X–L. This is not the case. Prikos owns 90% of the outstanding stock. Thus, while Prikos is a majority shareholder of X–L, he is not the sole owner.

rate officers or employees. *See* 42 U.S.C. § 9601(21).

X–L and Prikos contend that NutraSweet "failed to prove that either Defendant was an 'arranger' since arranger liability requires that [X–L] actually dispose of the hazardous substances onto [NutraSweet's] facility." Yet, while the portion of Defendants' contention relating to arranger liability is substantively correct, the contention is misplaced as to the instant inquiry. Arranger "liability" certainly depends on whether X–L disposed hazardous substances that eventually caused NutraSweet to incur response costs. However, the "liability" elements are found not at this second element, but at the third and fourth elements of the CERCLA *prima facie* case.

 Contrary to the arguments of X–L, the court finds that Prikos meets the definition of an "arranger." Prikos

> possessed the hazardous substances within the meaning of CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), because, as [X–L's President], [Prikos] had actual "control" over the [X–L] plant's hazardous substances.... It is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme. The [finding that Prikos, as President,] actually knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal of the [X–L] plant's hazardous substances [is crucial].... [P]roof of personal ownership or actual physical possession of hazardous substances as a precondition for liability under CERCLA § 107(a)(3) [is unnecessary].

*United States v. Northeastern Pharm. & Chem. Co., Inc.*, 810 F.2d 726 (8th Cir.1986). The fact that Prikos did not specifically authorize Krause to dump the mop-buckets is of no consequence; CERCLA is a strict liability statute. *See In re Chicago, Milwaukee, St. Paul & Pacific RR,* 974 F.2d 775, 779 (7th Cir.1992). A majority shareholder and corporate officer with "virtually unlimited control over a company and in fact exercises that control but knows well enough to close his or her eyes to the specific details of the company's hazardous waste disposal prac-

tices" cannot avoid "arranger" liability under CERCLA. *United States v. TIC Inv. Corp.,* 68 F.3d 1082, 1089 (8th Cir.1995). Prikos may have been completely without personal fault; yet, as an "arranger" of waste disposal, he is liable for CERCLA violations resulting from the improper disposal of the waste. Accordingly, the court finds Prikos to be a "responsible person" under CERCLA.

With regard to X–L, it is clear from the pleadings and evidentiary submissions that X–L operated the facility and arranged for the disposal of waste. Certainly the company itself is liable for the operation of its own facility and for the arrangement for the disposal of its own waste. Accordingly, the court finds that both Prikos and X–L are "responsible persons" under CERCLA.

 Third, the court finds that NutraSweet has sufficiently proven that a "release" of a hazardous substance occurred. Under CERCLA, "The term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). Federal courts should construe CERCLA's definition of "release" broadly. *See, e.g., New York v. Shore Realty Corp.,* 759 F.2d 1032, 1045 (2d Cir.1985) ("releases" include leaking tanks and pipelines, the continuing leaching and seepage from earlier spills, and leaking drums). There is no minimum quantitative requirement for a release of hazardous substances. *Stewman v. Mid–South Wood Products of Mena, Inc.,* 993 F.2d 646, 649 (8th Cir.1993); *Amoco,* 889 F.2d at 673.

Krause's conduct, which included spilling, emptying, and dumping the warm, grey liquid contained in the mop-bucket, clearly constitutes a release of the liquid. The IEPA test of the warm, grey liquid revealed the existence of various chlorinated and non-chlorinated VOCs, such as 1,1,1–TCA, TCE and PCE, which are listed by the USEPA as "hazardous substances." As such, NutraSweet established the third prong of its CERCLA *prima facie* case.

 The crux of this case, as in many CERCLA cases, involves the fourth element, i.e. the "causation" element, of § 107(a).

Thus, to prevail on its motion for summary judgment, keeping in mind the applicable burden of proof in the instant civil case, NutraSweet must provide sufficient evidence from which all reasonable people would agree that it is more likely than not that X–L and Prikos are liable under CERCLA. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

 In opposition to NutraSweet's motion, X–L argues that "there is no evidence that any of the mop-water migrated to the NutraSweet property." Yet, even assuming that such evidence does not exist, that evidence is not required for NutraSweet to prevail. NutraSweet does not have to prove that X–L's release of hazardous waste onto the portion of its own facility adjacent to NutraSweet's property actually and physically migrated and contaminated plaintiff's property; NutraSweet need only show that the release or threatened release of hazardous substances from the facility caused it to incur response costs. *Dedham Water Co. v. Cumberland Farms Dairy Inc.,* 889 F.2d 1146, 1154 (1st Cir.1989).[5]

Moreover, the court finds ludicrous X–L's contention relating to the non-existence of such evidence. Contrary to X–L's assertion, NutraSweet has provided the court with a surfeit of evidence which would prove that X–L violated CERCLA. While "individual pieces of evidence [are] insufficient in themselves to prove a point," the accumulation of the evidence can prove the point. *Bourjaily v. United States,* 483 U.S. 171, 179–80, 107 S.Ct. 2775, 2780–81, 97 L.Ed.2d 144 (1987). The aggregation of the evidence, which will be discussed *infra,* creates only a single reasonable inference: that NutraSweet expended money to decontaminate the land from chemicals originating from the X–L facility. This single reasonable inference compels the court to enter summary judgment in Nutra-Sweet's favor. Of noted importance are the following facts:

1. NutraSweet Did Not Use Chlorinated VOCs In Its Manufacturing Processes

The evidence shows that NutraSweet, a food-grade manufacturer, did not use poisonous and volatile chlorinated VOCs in manufacturing and processing the food goods. The Plant Manager conceded that Nutra-Sweet once employed a self-contained parts cleaner, which used a chlorinated solvent containing VOCs. However, the cleaner was located inside on concrete flooring. Further, no leaks, spills or other releases ever occurred from the parts cleaner. The parts cleaner housed and retained seven gallons of solvent. Periodically, NutraSweet sent the used solvent to the system's designer for recycling.

2. X–L Not Only Stored and Used VOCs, But Repeatedly Dumped A Mop–Bucket Containing VOCs Onto Land Adjacent to NutraSweet Property

Prikos admitted that it stored fifty-five gallon drums of CarborChlor containing 90% 1,1,1–TCA, a chlorinated VOC which breaks down into other chlorinated and non-chlorinated VOCs. Several individuals, including a NutraSweet employee and various state agents, noticed an X–L employee dumping a mop-bucket close to the X–L/NutraSweet border. Later, NutraSweet captured, on videotape, eighty-two occasions when Krause dumped the "warm, grey liquid" from the mop-bucket onto the portion of X–L land bordering the northeastern corner of Nutra-Sweet property. The IEPA and ISP investigators took samples of the "warm, grey liquid" in the mop-bucket, as well as the same "liquid on the ground as that which [Krause] had dumped from the bucket moments earli-

---

5. According to the First Circuit,

 To our knowledge, every court that has addressed this issue … has held that it is not necessary to prove actual contamination of plaintiff's property by defendant's waste in order to establish liability under CERCLA. There is nothing in the statute, its legislative history, or the case law, which requires proof that the defendant's hazardous waste actually have migrated to plaintiff's property, causing contamination of plaintiff's property, before CERCLA liability is triggered. Nor is there anything in the statute suggesting that a "two-site" case be treated differently than a one-site case, where the issue is whether a release or threat of release caused "response costs."

 *Dedham,* 889 F.2d at 1154.

er." Subsequent tests revealed high volumes of various chlorinated and non-chlorinated VOCs.

### 3. Experts State that the VOCs Journeyed to NutraSweet's Via The Groundwater Flow

Both Hill, a Principal Hydrogeologist, and Smith opine that the groundwater flowed in a south, southwesterly direction. Shepherd disagrees—by citing to two of the four sets of groundwater level readings at the NutraSweet property—and states that the groundwater actually moved in a south, southeasterly direction. Yet, Hill clarified the dispute: rainfall can temporarily alter local groundwater flow conditions due to the injection, or "recharge," of rainwater to the groundwater. Hill went on to state that the groundwater level readings shown in the February 1993 "potentiometric surface map" are most representative of the predominant, regional groundwater flow beneath the NutraSweet property. These readings were not temporarily influenced by rainfall since they were collected in winter when the surface soil above the groundwater is frozen, thus minimizing the influence of precipitation on the groundwater flow system. The February 1993 readings demonstrate a clear and indisputable south, *southwesterly* groundwater flow direction. Since NutraSweet land was located southwest of the "dumping" area, the only reasonable inference drawn from the groundwater flow direction is that the hazardous substances in the groundwater eventually travelled to NutraSweet land.

Moreover, even accepting Shepherd's opinion that the groundwater flowed in a south, *southeasterly* direction, the evidence still reveals that the contaminants would have reached the NutraSweet property. Hill stated that contaminants accumulating in groundwater spread through dispersion not only in the direction of the groundwater flow, but in a direction perpendicular, or "transverse," to the flow. As the contaminant flowed increasingly away from the site of the "dumps" by Krause, the width of the "contamination plume" similarly increased. Thus, even if the predominant, regional groundwater flow was to a south, southeast direction, the contaminants released by X–L would eventually migrate west to the NutraSweet via perpendicular, or transverse dispersion.

Further, notwithstanding the evidence regarding the flow of contaminants into the NutraSweet property via the predominant groundwater flow, NutraSweet provides unrebutted evidence that the drainage ditch along the northwestern boundary of the X–L property acted as an area of "differential discharge." Hill explained that as a result of the accumulated liquid in the dumping area, a groundwater recharge mound formed. This mound pushed the groundwater away from the dumping area in all directions, including the westerly direction.

### 4. The VOCs Contaminating the Adjacent NutraSweet Property Are Markedly High in Concentration and Identical to the VOCs Detected in the Dumping Area

NutraSweet has incurred costs to clean only VOCs from its land. NutraSweet has not undertaken to clean any other type of chemicals from its land. The VOCs found in the northeastern corner of the NutraSweet property are identical to those found in the mop-bucket and "dumping ground" by the IEPA and ISP investigators. Most notably, the ground and soil samples taken at the area closest to the X–L dumping area contain the highest concentrations of VOCs, much higher than those found in the other sample sites. As already discussed, the samples taken closest to the X–L "dumping" location showed total chlorinated VOCs at 49,100 ppb, compared to three other well samples, which revealed chlorinated VOCs of 2,590 ppb, 1,670 ppb, and 2,060 ppb. In other words, the NutraSweet area closest to X–L property had VOC levels in excess of twenty-five times the average of the other areas.

### 5. The Expert Opinions Show That The X–L Dumping Was A Cause of the Contamination on NutraSweet Property

Smith and Hill unequivocally opined that the continual, systematic dumping of the warm, grey liquid found in the mop-bucket

was the only cause of the contamination of NutraSweet's land. In support of their opinions, both Smith and Hill testify to the exact reasons for their "causal connection" conclusion, provide the documentation on which they based the conclusion, and cite to various portions of those documents which they each found noteworthy.

▮▮ In opposition of the opinions of Hill and Smith, Shepherd testified that "technical materials submitted by Plaintiffs in support of the motion for summary judgment fail to prove, through a degree of scientific certainty, that X–L Engineering Company was the cause of contamination found on the Nutra-Sweet Property, much less the sole cause." In support of this conclusion, Shepherd offers statements of facts without documentation to buttress the statements. For example, Shepherd states, "Past investigations and the remediation work performed at the NutraSweet Property indicate that numerous other chemical constituents ... were identified on the NutraSweet Property." Yet, Shepherd neither cites to nor provides documentation to support the statement of fact.

Further, Shepherd offers other "possible" sources of contamination. Shepherd frequently uses qualifying phrases in his affidavit: "... could have contributed to the contamination"; "... could be the source of contamination"; "... has not been collected and ... cannot be ruled out at this time"; "... could have been released"; and "could have been the source." Shepherd claims that the contamination "could have been" caused by spillage from railcars, weed control by railroad companies, leakage from underground tanks, and from prior possessors of the NutraSweet land. X–L has not provided the court with its own testing results of soil samples, hydrogeologic data or other technical data to support Shepherd's mere speculation of "possible sources." In the past, the court has remained consistent in holding that the "assertion of mere possibility," as made in the statements contained within the Shepherd affidavit, are "not enough to forestall summary judgment." *Pielet Bros. Scrap*

*Iron & Metal Ltd. P'ship v. Reynolds Metal Co.*, 1995 WL 370238, *2 (N.D.Ill.1995) (Norgle, J.) (citing *Hamm v. Runyon*, 51 F.3d 721, 724 (7th Cir.1995)). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316 (7th Cir.1996). The Shepherd exhibit begs the question, "why should a court rely on the sort of exposition a scholar would not tolerate in his professional life?" *Id.* It shouldn't, and neither should a jury. Mere speculation as to possible sources of contamination is not enough to defeat NutraSweet's motion. *Avery v. Mapco Gas Prods., Inc.*, 18 F.3d 448, 453–54 (7th Cir.1994).[6] Thus, the court finds that while the Shepherd affidavit may cast his personal doubt on the opinions of Hill and Smith, it fails to dispute the scientific evidence upon which Hill and Smith base their opinion. *See Navarro v. Fuji Inds, Inc.*, 925 F.Supp. 1323, 1327 (N.D.Ill. 1996).

### 6. The Totality of the Scientific Evidence

As already discussed, a court or jury need not make a finding as to the actual quantity of hazardous substances that traveled to NutraSweet's property. *Stewman*, 993 F.2d at 649 (8th Cir.1993); *Amoco*, 889 F.2d at 673. As long as a hazardous substance was released by X–L, no matter how small the volume, and the release caused NutraSweet to incur response costs, no matter how small the amount of money expended, X–L must be held liable for a violation of CERCLA. The court finds that the aggregation of evidence compels it to enter judgment in favor of NutraSweet. *See Bourjaily*, 483 U.S. at 179–80, 107 S.Ct. at 2780–81 (stating that even if "individual pieces of evidence [are] insufficient in themselves to prove a point," the accumulation of the evidence can do so). Given the following, the court finds that no genuine issues of fact exist as to the liability prong of CERCLA: (1) NutraSweet did not use chlorinated VOCs in its manufacturing processes, (2) X–L not only stored and used VOCs, but dumped a mop-bucket containing

---

**6.** The court notes that in *Pielet Bros.*, this court rejected an affidavit of Shepherd, the same consultant used by X–L in this case. For similar reasons, the court rejects Shepherd's instant affidavit.

VOCs onto land adjacent to NutraSweet property, (3) experts state that the VOCs journeyed to NutraSweet's property via groundwater flow, no matter whether the direction was south, southwesterly or south, southeasterly, (4) the VOCs contaminating the adjacent NutraSweet property are markedly high in concentration and identical to the VOCs detected in the dumping area, and (5) the unrebutted scientific evidence reveals that the mop-bucket dumping activity was a proximate or contributing cause (if not the sole cause) of the presence of VOCs on the NutraSweet property.[7] After presentment of the above evidence, any reasonable juror would come to a conclusion that it is more likely that not that at least a small amount of VOCs entered NutraSweet land because of the mop-bucket-dumping activity. Accordingly, the mere "scintilla of evidence" submitted by X–L is not enough. The court finds X–L liable for all response costs attributable to the dumping of VOCs.

This does not extinguish Count I in full, however. The court rules as to the liability prong, but finds a genuine issue of material fact as to the attributable damages. The court defers to trial the issue of appropriate damages. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989).

### B. Count II—CERCLA § 113

As discussed *supra,* Prikos and X–L are strictly liable for any necessary response costs. 42 U.S.C. § 9607(a). Thus, Nutra-Sweet may seek contribution from them pursuant to 42 U.S.C. § 9613(f). Yet, as previously discussed, a genuine issue of material fact still exists with regard to the extent of the injury and the amount of response costs. NutraSweet may, indeed, prevail on its argument that X–L is responsible for 100% of the costs. However, the court may not make such a factual determination. X–L is liable

for the amount of response costs attributable to the VOCs originating from the X–L facility. The extent of liability, and the resulting amount of recoverable costs, must be left for trial. Accordingly, the court enters judgment in favor of NutraSweet and against X–L as to the liability issue, but defers to a jury to decide the appropriate damages. *Amoco, Id.* at 668.

### C. Remaining Counts

#### 1. Count III—Declaratory Judgment

Neither party discusses the propriety of summary judgment as to Count III. However, the court finds the issue to be moot in light of the above discussion. As such, the court *sua sponte* dismisses Count III.

#### 2. Count IV—Private Nuisance

To prevail in an Illinois common law private nuisance action, NutraSweet must show that X–L's dumping invaded NutraSweet's interest in the use and enjoyment of its land, and that the invasion, whether intentional or negligent, is both substantial and unreasonable. *Statler v. Catalano,* 167 Ill.App.3d 397, 118 Ill.Dec. 283, 288, 521 N.E.2d 565, 570 (1988); *Woods v. Khan,* 95 Ill.App.3d 1087, 51 Ill.Dec. 470, 420 N.E.2d 1028 (1981). "The standard for determining if particular conduct is unreasonable is determined by the effect it would have on a normal person of ordinary habits and sensibilities." *Statler,* 118 Ill.Dec. at 288, 521 N.E.2d at 570. The Illinois Supreme Court determined that acts rising to the level of CERCLA violations, such as the discharge of untreated sewage, *Dierks v. Commissioners of Highways,* 142 Ill. 197, 31 N.E. 496 (1892), and the illegal dumping of refuse, *The N.K. Fairbank Co. v. Nicolai,* 167 Ill. 242, 47 N.E. 360 (1897), are abatable/temporary nuisances.[8] *Tamalunis v. City of Georgetown,*

---

7. For a discussion of the differences between sole and proximate causes, see *Taylor v. Illinois Cent. R.R.,* 8 F.3d 584, 587 (7th Cir.1993).

8. As stated *infra,* the damages issue will go to trial. "Whenever a harm to land occurs from a past invasion, the elements of damage to be considered are the difference in the value of the land before and after the harm, the loss of the use of the land, and the discomfort and annoyance to the party harmed as an occupant." *Stat-*

*ler,* 118 Ill.Dec. at 288, 521 N.E.2d at 570; Restatement (Second) of Torts § 929, at 544 (1979). "Since these three elements are disjunctive, a plaintiff could elect to collect for one or more elements of damage." *Id.* Since the complained of nuisance is a temporary one, i.e. one that can be rectified, the proper measure of damages is the discomfort and deprivation of the use and enjoyment of the land. *Id.*

185 Ill.App.3d 173, 185, 134 Ill.Dec. 223, 542 N.E.2d 402 (Ill.App.Ct.1989).

The court notes that while Krause's actions, which are attributable to X–L under the doctrine of respondeat superior, *American Home Assurance Co. v. Stone,* 864 F.Supp. 767, 778 (N.D.Ill.1994) (holding that, pursuant to Illinois law, a corporation is liable for the actions of its employees when the acts are committed within the scope of the employment relationship), were intentional, the eventual pollution of NutraSweet's land was not. The VOCs permeated the soil, entered the groundwater, and moved in directions lateral and perpendicular to the groundwater flow direction. The dumping was both negligent *per se* (as will be discussed below) and for purposes of a private nuisance action, constitutes an invasion. The court finds that the evidence submitted by NutraSweet, which remains unrebutted by X–L, sufficiently proves that the invasion was substantial, unreasonable, and tantamount to a private nuisance. As such, the court enters summary judgment in favor of NutraSweet and against X–L. Prikos, a shareholder and corporate officer, cannot be held individually liable for the negligent acts of X–L employees in which he did not participate. *Mannion v. Stallings & Co., Inc.,* 204 Ill.App.3d 179, 191, 149 Ill.Dec. 438, 561 N.E.2d 1134 ("It is established that, although corporate officers generally are not liable for the obligations of the corporation, they are personally liable to a victim of a tort for damages resulting from their personal participation in the tort"). NutraSweet makes no argument to pierce the corporate veil. Thus, Prikos is dismissed as a defendant to Count IV. Any nuisance damages NutraSweet may have suffered are attributable solely to X–L and will be tried before a jury.

### 3. Count V—Trespass

Illinois courts note that private nuisance and trespass causes of action may, as in this case, overlap. *Statler,* 118 Ill.Dec. at 288, 521 N.E.2d at 570 (citing Restatement (Second) of Torts § 821D, at 102 (1979)). The gist of the action of trespass to realty is an unlawful entry upon another's possession unlawfully and with force; the form of the instrumentality by which the close is broken is immaterial. (87 C.J.S. Trespass §§ 12–13, at 964–66.) ... The entry need not be in person * * *. Thus, the Trespass may be committed by casting earth, or other substances, upon another's land, by projecting anything into, over, or upon the land; by discharging water thereon, or by felling trees so that they fall upon the land. Trespass may also be committed by shooting onto or over the land, by explosions, by throwing inflammable substances, by blasting operations, by discharging soot and carbon * * *. It is immaterial whether or not the person committing the trespass is in the exercise of due care. * * * (87 C.J.S. Trespass § 13, at 966–67).

*Dial v. City of O'Fallon,* 75 Ill.App.3d 782, 784, 31 Ill.Dec. 168, 394 N.E.2d 84 (1979) (most recently cited in *Kelch v. Izard,* 227 Ill.App.3d 180, 187, 169 Ill.Dec. 131, 590 N.E.2d 1050 (Ill.App.Ct.1992)). A trespass may also occur when chemical substances seep into groundwater and make their way to another property. *Johnson v. Tipton,* 103 Ill.App.3d 291, 300, 59 Ill.Dec. 179, 431 N.E.2d 464 (Ill.App.Ct.1982). In the instant action, NutraSweet sufficiently proved that the hazardous substances "dumped" by X–L entered the NutraSweet land by way of the groundwater flow. The entry was unlawful, as it violated CERCLA. Much like discharging soot and carbon into the air, X–L discharged chlorinated and non-chlorinated VOCs onto the land. Even though X–L may have acted with due care, and even though the vehicle by which the contaminants moved was one of nature, the "dumping" of harmful substances eventually lead to a trespass to NutraSweet's land. The court, thus, finds that NutraSweet established a cause of action for trespass. Accordingly, with respect to Count V, the court finds that X–L is liable to NutraSweet for all damages incurred. For the reasons stated *supra,* Prikos is dismissed as a defendant to this count, and the amount of damages to be paid by X–L will be decided at trial.

### 4. Count VI—Negligence

To prove negligence in an Illinois court, NutraSweet "must establish that [X–

L] owed a duty of care, a breach of that duty, and an injury proximately caused by the breach." *Curatola v. Village of Niles*, 154 Ill.2d 201, 181 Ill. dec. 631, 608 N.E.2d 882 (Ill.1993). X–L and Prikos both "had a duty not to contaminate the environment." *People v. Brockman*, 143 Ill.2d 351, 372, 158 Ill.Dec. 513, 574 N.E.2d 626 (Ill.1991). *See also* CERCLA, 42 U.S.C. § 9607(a). This court's finding that X–L violated the provisions of CERCLA compels it to find, in turn, that X–L breached the duty. *Kalata v. Anheuser–Busch Cos., Inc.*, 144 Ill.2d 425, 434, 163 Ill.Dec. 502, 581 N.E.2d 656 (1991) (holding that the "violation of a statute or ordinance designed to protect human life or property is *prima facie* evidence of negligence"). NutraSweet certainly suffered an injury; it was forced to incur investigation and remediation costs to remove VOCs from its land. Thus, the only remaining negligence inquiry is the "causation" requirement. For the reasons stated above, the court finds that NutraSweet has sufficiently shown that the violation of CERCLA "caused" Nutra-Sweet to incur such costs such that a reasonable juror could only find this causation. Accordingly, with regard to Count VI, the court grants summary judgment in favor of Nutra-Sweet and against X–L. Again, Prikos is dismissed as a defendant. As with all other counts, the damage amount will be decided by jury and shall be paid from X–L's purse.

### 5. Attorney's Fees

While the court acknowledges its inherent and implied power to assess attorney's fees "as sanctions for bad-faith conduct in litigation," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the court declines to exercise its discretionary power in this case. The alleged "delay tactics" are not so egregious as to warrant penalties. As such, NutraSweet's request for attorney's fees is denied.

### V. *Conclusion*

The court dismisses Count III as moot. In all other counts, the court finds in favor of NutraSweet and against X–L as to liability. The court further finds in favor of Nutra-Sweet and against Prikos with regard to Counts I and II, and dismisses Prikos as a defendant to Counts IV, V, and VI. The remaining damages issues shall be tried before a jury on a date certain set by court in a subsequent minute order.

IT IS SO ORDERED.